Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART LLP
599 Lexington Avenue
New York, New York 10022-6030
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

Jerry S. McDevitt
Curtis B. Krasik
Jill D. Helbling
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
Attorneys for Plaintiff World
Wrestling Entertainment, Inc.



LEVY, M.J.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
WORLD WRESTLING                                                 :
ENTERTAINMENT, INC.,                                            :
                                                                :
                              Plaintiff,                        :
                                                                :
        -against-                                               :
                                                                :
ACCLAIM ENTERTAINMENT, INC.,                                    :
                                                                :
                              Defendant.                        :
----------------------------------------------------------------x

## **COMPLAINT**

Plaintiff World Wrestling Entertainment, Inc. ("WWE"), by and through its undersigned counsel, files this Complaint against Defendant Acclaim Entertainment, Inc. ("Acclaim") averring as follows:

## NATURE OF THE ACTION

1.     By this action, Plaintiff WWE seeks permanent injunctive relief and damages arising from Defendant Acclaim's unauthorized distribution of WWE's copyrighted video games based on WWE's programming, characters and associated indicia. Acclaim's unlawful conduct has resulted in sales of tens of millions of dollars of WWE copyrighted video games, the profits of which Acclaim has unfairly and unlawfully pocketed without a penny of compensation paid to WWE.

2.     From in or around March 1988 through November 1999, Acclaim had been WWE's licensee for the production and distribution of WWE-based video and computer games. The parties agreed to terminate their licensing relationship following a dispute between the parties arising out of an audit performed by WWE of Acclaim's books and records. Based on agreements entered into by the parties in connection with that termination, Acclaim was precluded from distributing any WWE video games anywhere in the world after August 31, 1999, except as specifically set forth in two limited post-termination distribution agreements. Over the last three years and continuing through today Acclaim has distributed WWE copyrighted games significantly in excess of the terms contained in those agreements.

3.     Acclaim's unauthorized distribution of WWE copyrighted games featuring WWE's copyrighted characters along with their associated marks and other indicia has infringed and unlawfully exploited WWE's valuable intellectual property assets in violation of federal and state law. Specifically, Acclaim's unlawful conduct involves the unauthorized distribution of four video games: (i) the ATTITUDE game; (ii) the WARZONE game; (iii) the IN YOUR HOUSE game; and (iv) WRESTLEMANIA: The Arcade Game (hereinafter, collectively referred to as "the Games"), designed for various different game platforms, such as Sony Play Station, Nintendo 64, Gameboy and Dreamcast. Acclaim's unauthorized distribution of the Games beyond the scope of its licensing rights has resulted in the infringement and unlawful

2

exploitation of WWE's registered copyrighted works, registered and common law trademarks and service marks (hereinafter, collectively, the "marks") and associated indicia.

## PARTIES

4. Plaintiff WWE is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products.

5. Defendant Acclaim is a Delaware corporation having its principal place of business at One Acclaim Plaza, Glen Cove, New York 11542. Acclaim develops and publishes video games and software for a variety of computer and game playing systems.

## JURISDICTION AND VENUE

6. This Complaint sets forth claims for federal copyright infringement arising under the Federal Copyright Act, 17 U.S.C. § 101 *et seq.*, as amended (the "Copyright Act"), trademark infringement arising under the Federal Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, as amended (the "Lanham Act"), misappropriation, false designation of origin and trade mark dilution under the Lanham Act, 15 U.S.C. § 1125, as well as New York state law claims for violations of New York statutes relating to trademark infringement and unfair competition, as well as the New York Anti-Dilution Statute, NY Gen, Bus. Law § 360 et seq., the New York Deceptive Trade Practices Statute, NY Gen. Bus. Law § 349, the New York Rights of Publicity Statute, NY Civil Rights Law § 51, and New York common law claims for unfair competition and breach of contract.

7.     This Court has jurisdiction over the subject matter of these claims and the parties pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121 (action arising under the Lanham Act) and 28 U.S.C. § 1338(a) and (b) (action arising under an Act of Congress relating to copyrights, trademarks and related unfair competition claims). This Court also may exercise supplemental jurisdiction of WWE's state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, *inter alia,* (i) Defendant Acclaim's corporate headquarters are located in this District; (ii) Acclaim regularly transacts business in this District, including the marketing and sale of the Games; and (iii) a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## THE FACTS

### WWE's Business Operations

9.     WWE has been involved in the sports entertainment business for over twenty years and has developed WWE into one of the most popular forms of entertainment today. WWE programming is perhaps best described as an action-packed episodic drama, which in many ways is akin to an ongoing, ever-developing soap opera.

10.     WWE develops interesting and well-formed story lines based around WWE's unique and attractive wrestling characters. The characters interact with one another and progress through the fictitious world of WWE by forming alliances and rivalries with other factions, groups and wrestlers. In creating its characters, WWE strives to make the viewer care about the character in one way or another, either by making him or her a protagonist or an antagonist or some interesting combination of both. Each wrestling character appears under a unique name and is portrayed with a unique persona, history, relationships, music and visual appearance and behavior. The creation of these characters, and the storylines in which they are

4

portrayed, require all of the elements of any effective story writing, whether in literature, television or the movies, including such elements as character, plot, theme, mood, suspense, climax and resolution.

11.     In the years it has promoted professional wrestling, WWE has developed a reputation for creativity in developing and then promoting distinctive characters and personas for its wrestling talent. This creativity in the development and portrayal of distinctive characters is a key reason for WWE's long-term popularity and success in the marketplace.

12.     Currently, WWE produces five nationally-distributed television programs each week: RAW on Monday nights on The National Network ("TNN"), SMACKDOWN! on Thursday nights on the United Paramount Network ("UPN"), HEAT on Sunday Nights on the Music Television Network ("MTV"), and VELOCITY and CONFIDENTIAL on Saturday nights on TNN.

13.     In addition to its weekly television programming, WWE engages in an extensive licensing program pursuant to which WWE's copyrighted characters, trademarks, service marks and other intellectual property rights are depicted on myriad consumer products, including, *inter alia,* T-shirts, posters and video games.

## WWE's Relationship with Acclaim

14.     On or about March 17, 1988, WWE and Acclaim entered into a Merchandising License Agreement ("the License Agreement") by which WWE agreed to license to Acclaim the rights to produce and distribute video games, including the Games, featuring certain WWE Licensed Property. (The License Agreement and the First through Fifth Amendments thereto are attached hereto and incorporated herein as Exhibit 1.) The Licensed Property consisted of the name "World Wrestling Federation" and all copyrights, trademarks, services marks and other intellectual property rights pertaining thereto or used therewith,

including such rights with respect to all professional wrestlers appearing as characters on WWE programming.

15.     Pursuant to the License Agreement, Acclaim explicitly acknowledged and agreed that WWE was the exclusive owner of all copyrights and other intellectual property rights created under the license.  For the avoidance of any ambiguity in this regard, the License Agreement expressly provides that Acclaim assigns to WWE any such intellectual property rights in all works created by Acclaim under the license:

> Licensee assigns to Licensor all copyrights, rights to ideas, and related intellectual property rights in any work created by Licensee utilizing the Licensed Property; and Licensee waives and releases in favor of Licensor any 'moral rights' or other personality rights in such works.

16.     Pursuant to the License Agreement, Acclaim also specifically acknowledged and agreed that WWE was the exclusive owner of all rights in the Licensed Property and that Acclaim in no way acquired any such rights through its license.

17.     Pursuant to the License Agreement, Acclaim further acknowledged the goodwill and recognition WWE had developed in its trademarks and service marks and that all rights and goodwill pertaining to those marks were exclusively owned by WWE:

> Licensee recognizes the great value of the publicity and goodwill associated with the Licensed Property, acknowledges that all trademarks and service marks pertaining thereto or used in connection therewith have acquired secondary meaning in the minds of the public and agrees that such trademarks and service marks [sic] all rights and goodwill attendant to them belong exclusively to Licensor and that all use of the Licensed Property and such trademarks and service marks pursuant to this Agreement shall inure to the benefit of Licensor (or any grantor of Licensor's rights).

18.  The term of the License Agreement was extended several times by a series of amendments dated January 25, 1990, May 1, 1991, April 21, 1993, December 31, 1997 and May 29, 1998 ("the 1998 Amendment").

19.  In or around mid-1999, WWE initiated an audit of Acclaim's books and records pursuant to its rights under the License Agreement. Based upon the results of that audit a dispute arose between the parties regarding Acclaim's compliance with certain restrictions imposed on Acclaim's distribution of the Games under the 1998 Amendment. Specifically, based on the results of its audit, WWE contended that Acclaim had violated the provisions of the 1998 Amendment restricting Acclaim from shipping a quantity of the Licensed Articles between May 1, 1999 and November 15, 1999 that exceeded the quantity of the Licensed Articles shipped between January 1, 1998 and November 15, 1998.

20.  This dispute ultimately led to the termination of the parties' licensing relationship.

## The Stop Shipment Acknowledgement and Settlement Agreement

21.  On or around September 14, 1999, Acclaim agreed to and executed a Stop Shipment Acknowledgement that provided in pertinent part that:

> As of August 31, 1999, Acclaim Entertainment, Inc. ('Acclaim') acknowledges and agrees that it has shipped all units of the Licensed Articles permitted under the terms of a certain amendment dated May 29, 1998 to a Consumer Products License Agreement entered into between the parties ('Amendment'). Thereafter through expiration of the Agreement on November 15, 1999, Acclaim represents and warrants that it will not ship any Licensed Articles, in any form or manner, or under any circumstances, whatsoever, without the advance written permission of World Wrestling Federation Entertainment, Inc. ('WWFE').

22.  On or around October 1, 1999, WWE and Acclaim executed a settlement agreement (the "Settlement Agreement") terminating the parties' licensing relationship and

settling any potential claims specifically arising out of WWE's audit. Among other things, the Settlement Agreement provided that the License Agreement "shall be and is hereby terminated and cancelled effective as of November 15, 1999 ('Termination Date')." The Settlement Agreement and Stop Shipment Acknowledgement are attached hereto and incorporated herein as Exhibit 2.) The Settlement Agreement further provided that:

> Acclaim hereby reaffirms, as per the terms of the Stop Shipment Acknowledgement, that it shall not and will not ship or distribute any Licensed Articles pursuant to the Agreement without the advance written permission of WWFE and WWFE's new licensee for the video category currently held by Acclaim, a joint venture known as THQ/Jakks ('TJ').

23.     Pursuant to the Stop Shipment Acknowledgement and the Settlement Agreement, Acclaim was prohibited from selling any Games after August 31, 1999 without WWE's (and TJ's) advance written permission. The Settlement Agreement did allow Acclaim to attempt to "negotiate the shipment and distribution of additional Licensed Articles ('Product Distribution Plan') through the Termination Date. Any and all such Product Distribution Plans must be reduced to writing and executed by Acclaim, WWFE, and TJ prior to the implementation of said plan."

**The Product Distribution Plan**

24.     On or around October 15, 1999, WWE and Acclaim entered into a Licensed Product Distribution Plan ("the Plan"). (The Plan is attached hereto and incorporated herein as Exhibit 3.) The Plan authorized Acclaim to distribute certain Games in limited, specifically-identified quantities for a limited period of time prior to the termination date of the License Agreement on November 15, 1999. Specifically, the Plan authorized Acclaim to distribute the Games as follows:

(a)     ATTITUDE Game – Playstation

(i)     No more than 300,000 units of the ATTITUDE game for use on the Sony Play Station platform to customers within the United States and Canada. The Plan required that all such shipments be completed prior to November 5, 1999;

(ii)    No more than 175,000 units of the ATTITUDE game for use on the Sony Play Station platform to customers outside the United States and Canada. The Plan required that all such shipments be completed prior to November 5, 1999.

(b)    ATTITUDE Game – Dreamcast

(i)     No more than 250,000 units of the ATTITUDE game for use on the Dreamcast platform to customers within the United States and Canada. The Plan required that all such shipments be completed prior to November 15, 1999;

(ii)    No more than 100,000 units of the ATTITUDE game for use on the Dreamcast platform to customers outside the United States and Canada. The Plan required that all such shipments be completed prior to November 15, 1999.

(c)    ATTITUDE Game – Sony Classic Line

(i)     No more than 500,000 units of the ATTITUDE game for the Sony Classic Line. However, such distribution was required to be made solely through THQ/Jakks.

(d)    ATTITUDE Game – Nintendo 64 and Gameboy

(i)     The Plan prohibited Acclaim from shipping any ATTITUDE games useable and/or applicable to the Nintendo 64 or Gameboy platforms. Acclaim agreed that TQH/Jakks would distribute WWE games on Nintendo 64 and Gameboy platforms beginning on November 1, 1999.

25.    Except as authorized by the Amended Product Distribution Plan, on the terms set forth below, after the termination date of the License Agreement on November 15, 1999 Acclaim was prohibited from distributing any of the Games anywhere in the world under any circumstances.

## Amended Product Distribution Plan

26.     On April 24, 2000, WWE and Acclaim entered into an Amendment to Limited Licensed Product Distribution Plan ("the Amended Plan").  (The Amended Plan is attached hereto and incorporated herein as Exhibit 4.)  This Amended Plan allowed Acclaim to ship certain additional products during the time period beginning April 1, 2000 through May 31, 2000.  Specifically, the Amended Plan authorized Acclaim to distribute the Games as follows:

   (a)     61,257 units of the WARZONE game for the Nintendo 64 platform;

   (b)     36,731 units of the WARZONE game for the Play Station platform;

   (c)     2,915 units of the ATTITUDE game for the Nintendo 64 platform; and

   (d)     2,537 units of the ATTITUDE game for the Play Station platform.

27.     With the limited exception of the distribution of the foregoing Games as set forth in the Amended Plan, Acclaim was prohibited from otherwise distributing the Games during the time period of the Amended Plan between April 1, 2000 and May 31, 2000.

28.     After May 31, 2000, Acclaim was prohibited from distributing any of the Games anywhere in the world under any circumstances.

29.     Acclaim has violated the Plan and the Amended Plan by, *inter alia*, (i) distributing Games covered by the Plan and the Amended Plan in excess of the permitted quantities of those Games as set forth in the Plan and the Amended Plan; (ii) distributing Games covered by the Plan and the Amended Plan outside the time periods authorized by the Plan and the Amended Plan; (iii) distributing Games Acclaim was prohibited from distributing under the Plan and the Amended Plan after August 31, 1999; and/or (iv) failing to properly and accurately report and pay royalties to WWE for sales of Games under the Plan and the Amended Plan.

## Acclaim's Willful Violation of WWE's Intellectual Property Rights

30.     Through its deliberate, unauthorized distribution of the Games in violation of the Plan and the Amended Plan, Acclaim has willfully violated WWE's valuable intellectual property rights in the Games and the Licensed Property depicted in the Games. Acclaim's unlawful acts have, *inter alia*:

    (i)    infringed WWE's exclusive rights as the owner of valid copyrights in the Games;

    (ii)    infringed WWF's exclusive rights as the owner of valid copyrights in the characters that appear in the Games;

    (iii)    deliberately confused and deceived the public by and through Defendant Acclaim's unauthorized exploitation of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and WWE's other marks and indicia used in the Games as to WWE's sponsorship, affiliation, approval and/or endorsement of Defendant Acclaim's products featuring those marks and WWE's characters that appear in those Games; and

    (iv)    unlawfully and unfairly traded on WWE's intellectual property, including, but not limited to, the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and WWE's other marks and indicia, used in the Games so as likely to confuse consumers as to WWE's sponsorship, affiliation, approval and/or endorsement of Defendant Acclaim's products.

## The Irreparable Harm Suffered by WWE

31.     As a result of Defendant Acclaim's knowing and willful violations of WWE's intellectual property rights, WWE has been, and continues to be, irreparably harmed.

32.     Among other things, WWE has lost its exclusive right and ability to control and/or determine the manner, appearance, timing, location, content and image of the use of (i) WWE's copyrighted video games; (ii) WWE's copyrighted characters that appear in the Games; and (iii) the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR

HOUSE marks, the WWF Scratch Letter Logo and WWE's other marks and indicia used in the Games, in which intellectual property WWE has invested considerable resources creating, developing and promoting.

33. Conversely, Defendant Acclaim has, and continues to, willfully, unlawfully and unjustly benefit from its misappropriation and exploitation of (i) WWE's copyrighted video games; (ii) WWE's copyrighted characters that appear in the Games; and (iii) the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and WWE's other marks used in the Games, without WWE's approval and/or consent.

34. Because of Defendant Acclaim's ongoing and continuous violations of WWE's intellectual property rights, WWE seeks a permanent injunction from this Court enjoining Defendant Acclaim from using, exploiting or in any way trading on WWE's legally protected (i) copyrighted video games; (ii) copyrighted characters that appear in the Games; and (iii) the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and WWE's other marks and indicia used in the Games. Separately, WWE seeks to recover damages, including, but not limited to, a disgorgement of Defendant Acclaim's profits from international sales, arising from Defendant Acclaim's violations of WWE's intellectual property rights with respect to the Games.

## COUNT I

### Breach of Contract

35. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

36. The Plan and Amended Plan were valid and enforceable contracts between WWE and Acclaim.

37. WWE has fully performed all of its obligations under the Plan and Amended Plan.

38. By the conduct set forth herein, Defendant Acclaim has breached the Plan and Amended Plan.

39. As a result of Acclaim's unlawful conduct as set forth herein, WWE has suffered damages in an amount to be determined at trial.

## COUNT II

## Copyright Infringement

40. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

41. WWE is the owner of the copyrighted video games, ATTITUDE, WRESTLEMANIA: The Arcade Game, IN YOUR HOUSE and WARZONE, designed for various different game platforms, featuring WWE characters, marks and other indicia.

42. WWE has complied in all respects with the Copyright Act of 1976, as amended, and all other laws governing copyright, and secured the exclusive right and privilege in and to the copyright of each such work.

43. Defendant Acclaim has copied WWE's copyrighted video games and/or otherwise violated WWE's exclusive rights as the copyright owner of the Games in connection with its distribution of the Games in violation of the Plan and Amended Plan.

44. Defendant Acclaim has had access to WWE's copyrighted works.

45. A substantial similarity exists between the Games distributed by Acclaim in violation of the Plan and Amended Plan and WWE's copyrighted video games.

46. Defendant Acclaim's acts of copying and distributing WWE's copyrighted video games without authority or consent constitute willful copyright infringement in violation of the Copyright Act of 1976.

47. Defendant Acclaim's acts described herein have caused and, unless restrained, will continue to cause WWE damages and irreparable harm.

## COUNT III

### Copyright Infringement

48. The allegations set forth in the preceding paragraphs are incorporated herein by reference and reasserted as if fully set forth at length.

49. WWE is the owner of numerous copyrighted works depicting and distinctively delineating the characters that appear in the Games. As a result of WWE's ownership of such copyrighted works, the characters that are distinctively delineated in those works are entitled to copyright protection.

50. WWE has complied in all respects with the Copyright Act of 1976, as amended, and all other laws governing copyright, and secured the exclusive right and privilege in and to the copyright of each such work.

51. Defendant Acclaim has copied WWE's copyrighted characters that appear in the Games as distinctively delineated in WWE's copyrighted works in connection with its distribution of the Games in violation of the Plan and Amended Plan.

52. Defendant Acclaim has had access to WWE's copyrighted works.

53.     A substantial similarity exists between the characters that appear in the Games distributed by Acclaim in violation of the Plan and Amended Plan and WWE's copyrighted characters as distinctively delineated in WWE's copyrighted works.

54.     Defendant Acclaim's acts of copying WWE's copyrighted characters that appear in the Games as distinctively delineated in WWE's copyrighted works in connection with the distribution of Games in violation of the Plan and Amended Plan constitute willful copyright infringement in violation of the Copyright Act of 1976.

55.     Defendant Acclaim's acts described herein have caused and, unless restrained, will continue to cause WWE damages and irreparable harm.

## COUNT IV

### Trademark Infringement Under Section 32 of the Lanham Act

56.     The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

57.     WWE is the owner of the WWF and WWF Scratch Logo registered marks, the WRESTLEMANIA registered mark, the ATTITUDE registered mark, the IN YOUR HOUSE registered mark, and other registered marks used in the Games. WWE has complied in all respects with the Trademark Act of the United States and all other laws governing trademarks and secured the exclusive right and privilege in and to these marks.

58.     WWE has used the WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games exclusively and continuously in commerce to identify its sports entertainment programming and its related products and services.

59. WWE's WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are inherently distinctive because they are arbitrary and/or suggestive. Moreover, and/or alternatively, WWE's WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games have gained substantially secondary meaning through WWE's notorious and extensive use and promotion of the marks. The WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are uniquely associated with WWE and have become indelibly linked in the public's mind in exclusive association with, and in exclusive sponsorship by, WWE.

60. Defendant Acclaim's unauthorized use of WWE's registered WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and the other marks used in the Games distributed in violation of the Plan and Amended Plan as described herein, is likely to, and did, cause confusion or mistake, or to deceive consumers as to the origin, sponsorship or approval of Defendant Acclaim's use of the WWF WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and the other marks used in the Games distributed in violation of the Plan and Amended Plan.

61. Defendant Acclaim's unauthorized use of WWE's registered WWF, WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and the other marks used in the Games distributed in violation of the Plan and Amended Plan constitutes willful trademark infringement in violation of Section 32 of the Lanham Act.

62. The threat of the loss of WWE's right to control and exploit the use of each of the foregoing marks and the substantial reputation, goodwill, and indelible association with WWE of its services and goods is real and substantial.

63. Defendant Acclaim's acts described herein have infringed WWE's marks, caused WWE damages, injured WWE's business, reputation and goodwill, and, unless restrained and enjoined, will continue to cause WWE irreparable harm.

## COUNT V

## Trademark Infringement and False Designation of Origin Under Section 43(a) of the Lanham Act

64. The allegations set forth in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

65. WWE is the owner of federally registered and/or common law trademark rights in the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games.

66. WWE has used the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games exclusively and continuously in commerce to identify its sports entertainment programming and its related products and services.

67. WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are inherently distinctive because they are arbitrary and/or suggestive. Moreover, and/or alternatively, WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games have gained substantially secondary meaning through WWE's notorious and extensive use and promotion of the marks. The WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games

are uniquely associated with WWE and have become indelibly linked in the public's mind in exclusive association with, and in exclusive sponsorship by, WWE.

68. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact, and/or false and misleading representations of fact, as described herein, are likely to, and did, cause confusion or mistake, or to deceive consumers as to WWE's affiliation, connection, or association with Defendant Acclaim's unauthorized use of the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks and indicia used in the Games.

69. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and false and/or misleading misrepresentations of fact, as described herein, are likely to, and did, cause confusion or mistake, or to deceive consumers as to the origin, sponsorship or approval of Defendant Acclaim's use of the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games as associated with WWE.

70. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and/or false and misleading misrepresentations of fact, as described herein, are likely to, and did, cause confusion or mistake, or deceive consumers as to WWE's commercial activities.

71.     Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, as described herein, constitutes willful trademark infringement and false designation of origin in violation of Section 43(a) of the Lanham Act.

72.     The threat of the loss of WWE's right to control and exploit the use of its WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games, and the substantial reputation, goodwill, and indelible association with WWE of its services and goods is real and substantial.

73.     Defendant Acclaim's acts described herein have infringed WWE's marks, injured WWE's business, reputation and goodwill, and, unless restrained and enjoined, will continue to cause WWE irreparable harm.

## COUNT VI

### Trade Dress Infringement Under Section 43(a) of the Lanham Act

74.     The allegations set forth in the preceding paragraphs are incorporated herein by reference and reasserted as if fully set forth at length.

75.     WWE is the owner of legally protected trade dress rights in the WWE characters that appear in the Games.

76.     WWE has used the trade dress of the characters that appear in the Games exclusively and continuously in commerce to identify its sports entertainment programming and its related products and services.

77.     WWE's trade dress in the characters that appear in the Games is inherently distinctive because it is arbitrary and/or suggestive. Moreover, and/or alternatively, the trade

dress in the characters that appear in the Games has gained substantially secondary meaning through WWE's notorious and extensive use and promotion of the characters and their trade dress. The trade dress of the characters that appear in the Games is uniquely associated with WWE and has become indelibly linked in the public's mind in exclusive association with, and in exclusive sponsorship by, WWE.

78.     Defendant Acclaim's unauthorized use of WWE's legally protected trade dress rights in WWE's characters that appear in the Games in violation of the Plan and Amended Plan, as described herein, constitutes willful trade dress infringement in violation of Section 43(a) of the Lanham Act.

79.     Defendant Acclaim's unauthorized use of WWE's legally protected trade dress rights in WWE's characters that appear in the Games in violation of the Plan and Amended Plan, as described herein, is likely to, and did, cause confusion or mistake, or to deceive consumers as to the origin, sponsorship or approval of Defendant Acclaim's unauthorized use of WWE's legally protected trade dress in the Games distributed in violation of the Plan and Amended Plan.

80.     The threat of the loss of WWE's right to control and exploit the use of its marks and trade dress associated with the WWE characters that appear in the Games, and the substantial reputation, goodwill, and indelible association with WWE of its services and goods is real and substantial.

81.     Defendant Acclaim's acts described herein have infringed WWE's marks and trade dress, injured WWE's business, reputation and goodwill, and, unless restrained and enjoined, will continue to cause WWE irreparable harm.

## COUNT VII

## Misappropriation and Unfair Competition Under Section 43(a) of the Lanham Act

82. The allegations set forth in the preceding paragraphs are incorporated herein by reference and reasserted as if fully set forth at length.

83. WWE is the owner of federally registered and/or common law trademark rights in the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games.

84. WWE has used the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games exclusively and continuously in commerce to identify its sports entertainment programming and its related products and services.

85. WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are inherently distinctive because they are arbitrary and/or suggestive. Moreover, and/or alternatively, WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games have gained substantially secondary meaning through WWE's notorious and extensive use and promotion of the marks. The WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are uniquely associated with WWE and have become indelibly linked in the public's mind in exclusive association with, and in exclusive sponsorship by, WWE.

86. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact, and/or false and misleading representations of fact, as described herein, are likely to, and did, cause confusion or mistake, or deceive consumers as to WWE's affiliation, connection, or association with Defendant Acclaim's unauthorized use of the

WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games.

87. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and false and/or misleading misrepresentations of fact, as described herein, are likely to, and did, cause confusion or mistake, or to deceive consumers as to the origin, sponsorship or approval of Defendant Acclaim's unauthorized use of the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games, as associated with WWE.

88. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and/or false and misleading misrepresentations of fact, as described herein, are likely to, and did, cause confusion or mistake, or to deceive consumers as to WWE's commercial activities.

89. Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and/or false and misleading misrepresentations of fact, as described herein, constitutes willful misappropriation and unfair competition in violation of Section 43(a) of the Lanham Act.

90. The threat of the loss of WWE's right to control and exploit the use of its WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF

Scratch Letter Logo and the other marks used in the Games, and the substantial reputation, goodwill, and indelible association with WWE of its services and goods is real and substantial.

91. Defendant Acclaim's acts described herein have infringed WWE's marks, injured WWE's business, reputation and goodwill, and, unless restrained and enjoined, will continue to cause WWE irreparable harm.

**COUNT VIII**

**Violation of New York Common Law Unfair Competition**

92. The allegations set forth in the preceding paragraphs are incorporated herein by reference and reasserted as if fully set forth at length.

93. WWE owns federal statutory and/or common law trademark rights in the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games.

94. WWE has used the WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games exclusively and continuously in commerce to identify its sports entertainment programming and its related products and services.

95. WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are inherently distinctive because they are arbitrary and/or suggestive. Moreover, and/or alternatively, WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games have gained substantially secondary meaning through WWE's notorious and extensive use and promotion of the marks. The WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN

23

YOUR HOUSE marks, the WWF Scratch Logo and other registered marks used in the Games are uniquely associated with WWE and have become indelibly linked in the public's mind in exclusive association with, and in exclusive sponsorship by, WWE.

96.     Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and/or false and misleading misrepresentations of fact, as described herein, are likely to, and did, cause confusion or mistake, or to deceive consumers as to the origin, sponsorship or approval of Defendant Acclaim's use of the WWF WRESTLEMANIA, ATTITUDE and IN YOUR HOUSE marks, the WWF Scratch Logo and the other marks used in the Games distributed in violation of the Plan and Amended Plan.

97.     Defendant Acclaim's unauthorized use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan, false and misleading descriptions of fact and/or false and misleading misrepresentations of fact, as described herein, constitutes willful misappropriation and unfair competition under New York common law.

98.     Defendant Acclaim's unauthorized and unlawful use of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan was in bad faith, willful and/or with the intent to deceive.

99.     The likelihood of consumer confusion and injury to WWE's business reputation as a result of Defendant Acclaim's unfair competition is real and substantial.

100.    Defendant Acclaim's unauthorized and unlawful use and exploitation of WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games in violation of the Plan and Amended Plan have injured WWE's business, reputation and goodwill, and, unless restrained and enjoined, will continue to cause WWE further irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, WWE respectfully requests that this Honorable Court award WWE the following relief:

(1) a permanent injunction enjoining Defendant Acclaim from in any way copying, using, exploiting or trading on WWE's legally protected copyrighted video games, including WRESTLEMANIA: The Arcade Game, ATTITUDE, WARZONE and IN YOUR HOUSE and the copyrighted characters that appear in those Games;

(2) a permanent injunction enjoining Defendant Acclaim from in any way using, exploiting or trading on WWE's WWF, WRESTLEMANIA, ATTITUDE, WARZONE and IN YOUR HOUSE marks, the WWF Scratch Letter Logo and the other marks used in the Games, or any derivations thereof, in a way that will cause confusion as to the affiliation, sponsorship or content of the Games by WWE;

(3) actual damages sustained by WWE with respect to the Games distributed by Acclaim in violation of the Plan and Amended Plan, enhanced and/or trebled as permitted by law;

(4) disgorgement of Defendant Acclaim's international profits with respect to the Games distributed by Acclaim in violation of the Plan and Amended Plan, enhanced and/or trebled as permitted by law;

(5) statutory damages pursuant to the Copyright Act and the Lanham Act enhanced as permitted by law as a result of Defendant Acclaim's willful violations of WWE's intellectual property rights with respect to the Games distributed by Acclaim in violation of the Plan and Amended Plan;

(6) punitive damages as provided by New York law as a result of Defendant Acclaim's willful, bad faith violations of WWE's intellectual property rights with respect to the Games distributed by Acclaim in violation of the Plan and Amended Plan;

(7) an accounting by Defendant Acclaim of all revenues and profits relating to and/or arising from its unlawful conduct;

(8) attorneys' fees and costs; and

(9) such other and further relief as this Court deems just and appropriate.

JURY TRIAL DEMANDED

Dated:   November 5, 2002                     Respectfully submitted,

_____
Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART LLP
599 Lexington Avenue
New York, New York 10022-6030
Telephone:  (212) 536-3900
Facsimile:  (212) 536-3901


Jerry S. McDevitt
PA I.D. No. 33214
Curtis B. Krasik
PA I.D. No. 81150
Jill D. Helbling
PA I.D. No. 85959

KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World
Wrestling Entertainment, Inc.



## MERCHANDISING LICENSE AGREEMENT

This Agreement is made as of this 17th day of March 1988, between TITAN SPORTS, INC. ("Licensor") whose address is 1055 Summer Street, P.O. Box 3857, Stamford, Connecticut 06905, USA, on the one hand, as represented by its agent DIC Merchandising Enterprises, Inc. ("Agent") whose address is 3601 W. Olive Avenue, Burbank, California 91505, USA, and ACCLAIM ENTERTAINMENT, INC. whose address is 189 South Street, Oyster Bay, NY 11771 on the other hand, ("Licensee").

1. <u>License</u>. Pursuant to the terms and conditions of this Agreement, Licensor grants to Licensee and Licensee takes from Licensor, the exclusive license to use the Licensed Property solely in connection with the manufacture, sale and distribution of the Licensed Articles in the Licensed Territory during the Licensed Term.

Licensee agrees that it will sell and distribute the Licensed Articles covered by this Agreement in the Licensed Territory outright and not as a premium, promotional or commercial tie-in, endorsement or give-away, and only to jobbers, wholesalers and/or distributors, merchants and retail stores for sale and resale directly to the public. Licensee shall not, without the prior consent of Licensor, knowingly sell or distribute such articles to jobbers, wholesalers, distributors, retail stores or merchants whose sales or distributions are or will be made for publicity or promotional or commercial tie-in purposes, combination sales, premiums, giveaways or similar methods of merchandising.

Licensee agrees during the term hereof that it shall not acquire the right to produce any products or services using the name of any professional wrestling organization other than the World Wrestling Federation ("WWF") or its affiliates or the name and/or likeness of any professional wrestler who is not affiliated with Licensor and/or the WWF.

Licensor specifically reserves to itself all other rights with respect to the distribution and sale of the Licensed Articles through all other channels of trade including, but not limited to: in-arena sales, catalogue sales, premiums, direct mail, electronic shopping, vending machines, promotional and commercial tie-ins and endorsements. Also, Licensor shall have the exclusive right to sell the Licensed Articles at any and all wrestling exhibitions or by mail order; and Licensor may license others to arrange or assist in such sales.

2. <u>Licensed Property</u>. The Licensed Property consists of the following:

(i)   The name <u>WORLD WRESTLING FEDERATION</u>; and all symbols, designs, styles, emblems, logos and initials thereof; as well as all copyrights, trademarks or service marks, such as <u>WWF</u>, pertaining thereto or used in connection therewith;

(ii)   The publicity rights and intellectual property of
certain professional wrestlers, including their names,
likenesses, physical characteristics, personalities,
characters and personas; and all symbols, designs,
styles, emblems, logos, initials and visual recordings
or representations thereof; as well as all copyrights,
trademarks and service marks pertaining thereto or used
in connection therewith.  (Upon or after Licensor
executes agreements with any professional wrestler
securing exclusively unto Licensor such wrestler's
publicity and intellectual property rights, Licensor
shall so notify the Licensee in writing and the
professional wrestler's publicity and intellectual
property rights shall be part of the Licensed Property);
and

(iii)  The name "Hulk Hogan's Rock 'N' Wrestling" animated
television series (it being understood and agreed that
Licensee shall have no interest whatsoever in or to such
television series itself); and the names, likenesses,
physical characteristics, symbols, designs, styles,
emblems, logos, initials, and visual recordings or
representations thereof, as depicted graphically in the
Agent's Stylebook; as well as all copyright, trademark,
or service marks pertaining thereto or used in
connection therewith.

Collectively all of the foregoing shall be known and referred to
herein as the "Licensed Property".

   3.  Licensed Articles.  The Licensed Articles are set forth in
Exhibit A(7).  All items not included as a Licensed Article are
specifically excluded and Licensor may exploit same at its sole
discretion.

   4.  Licensed Term.  The Licensed Term will consist of the
Initial Term, as well as any Extension Term.  The Initial Term is
the period set forth in Exhibit A(8) unless sooner terminated as
provided herein.  The Extension Term, if any, is the period set
forth in Paragraph 10, if Licensee duly exercises its option for an
extension.

   5.  Licensed Territory.  The Licensed Territory is set forth
in Exhibit A(10).  Licensee will not use nor authorize any one else
to use the Licensed Property outside the Licensed Territory and
will not knowingly sell Licensed Articles to persons for resale
outside the Licensed Territory.

   6.  Marketing Date.  Licensee shall market for sale reasonable
quantities of the Licensed Articles (Nintendo format only) not
later than the date set forth in Exhibit A(9).  Failure by Licensee
to meet the marketing date set forth in Exhibit A(9) shall give
Licensor the option to terminate this Agreement upon thirty (30)
days prior written notice.  Should Licensee fail to so distribute
prior to the expiration of such thirty (30) day period, such

-2-

termination shall become effective at the end thereof and Licensor shall be entitled to retain any payments made by Licensee, and all rights shall automatically revert to Licensor.

7. <u>Royalty</u>. Licensee shall pay Licensor Royalties for the Licensed Articles equal to the number of items shipped multiplied by the per unit royalty indicated in Exhibit A(13), of all shipments of Licensed Articles by Licensee or its parents, affiliated, associated or subsidiary companies or any of its approved sub-licensees, less only customary and standard cash, quantity and freight discounts actually taken, and returns for defective or damaged Licensed Articles. Discounts and returns may not exceed five percent (5%) of gross sales during the applicable Reporting Period. No deductions may be made for uncollectible accounts or advertising allowances. No costs incurred in the manufacture, distribution, sale or exploitation of the Licensed Articles may be deducted in computing the Royalty.

8. <u>Advance</u>. Licensee shall pay Licensor a non-returnable Advance as set forth in Exhibit A(11) upon signature of this Agreement. Such Advance shall be credited against Royalties payable pursuant to Paragraph 7 hereof. The Advance will be part of the Guarantee, if any, described in Paragraph 9.

9. <u>Guarantee</u>. Licensee shall pay Licensor the sum set forth in Exhibit A(12) as a Guarantee against the Royalties due during the Initial Term. The Advance paid pursuant to Paragraph 8 will be an initial payment of the Guarantee. If, by the termination or expiration of the Initial Term, Licensor has not received Royalties at least equal to the Guarantee, then Licensee shall immediately pay Licensor the difference between the Royalties actually received by Licensor and the Guarantee. Neither the Advance nor any portion of the Guarantee shall be refundable.

10. <u>Extension Term</u>. Licensee will have the option to extend the Initial Term for an additional three (3) year period (the "Extension Term"), but only if all of the following conditions have first been satisfied:

(i)   Exhibit A (14)(i) provides for an extension option;

(ii)  At least sixty (60) days before the expiration of the Initial Term, Licensee gives Licensor written notice of its desire to extend the Initial Term;

(iii) At the time Licensee gives such written notice, Licensor has received Royalties (including the Advance) of not less than One Hundred and Fifty Percent (150%) of the Guarantee (which includes the Advance);

(iv)  Licensee's written notice is accompanied by payment of a non-refundable Extension Advance as set forth in Exhibit A(14)(ii), if any;

(v)    At the time Licensee gives its notice, and for the re-mainder of the Initial Term, Licensee is not in default under any material term, covenant or condition of this Agreement.

During the Extension Term, Licensee shall pay Licensor the sum set forth in Exhibit A(14)(iii), if any, as an Extension Guarantee against the Royalties due during the Extension term.  The Extension Advance will be an initial payment of the Extension Guarantee.  If, by the termination or expiration of the Extension Term, Licensor has not received Royalties at least equal to the Extension Guarantee, then Licensee shall immediately pay Licensor the difference between the Royalties actually received by Licensor during the Extension Term and the Extension Guarantee.  Neither the Extension Advance nor any portion of the Extension Guarantee are refundable.

11.  <u>Exploitation By Licensee</u>.  During the Licensed Term, Licensee shall be granted the right to manufacture, distribute and sell the Licensed Articles to jobbers, wholesalers, distributors, merchants and retail stores throughout the Licensed Territory for sale or resale directly to the public in accordance with all applicable laws, treaties and governmental regulations.  Licensee shall maintain a policy of high standards as to distribution, sale and exploitation of the Licensed Articles which will in no manner reflect adversely upon the Licensed Property, Licensor or Agent. The Licensed Articles must be of such style, appearance and quality as to be adequate and suited for exploitation to the best advantage and to the protection and enhancement of the Licensed Property. Licensor shall provide materials as per Paragraph 12 and all products produced using materials thus supplied must be approved in writing by Licensor prior to manufacture.

Licensee shall use its best efforts to maximize revenue and sales of its Licensed Articles, including reasonable advertising for the Licensed Articles so as to prominently feature the Licensed Property.  However, Licensee makes no representations or warranties relating to how much revenue will be generated by the sale of Licensed Articles beyond its obligation to pay the Advance.

If Licensee distributes or sells Licensed Articles, directly or indirectly, to itself, to any of its affiliated, associated, or subsidiary companies, or to the officers, directors. employees, or major stockholders or any of them, for ultimate sale to unrelated third parties, and if such distribution or sale is either not billed, or billed at special prices, not generally available to the trade, then Licensee shall pay Royalties with respect to such sale or distribution based upon the Net Sales price of such Licensed Articles generally sold to the trade by Licensee.

Licensee shall not sell any Licensed Article in combination with other goods ("Unlicensed Goods").  A combination sale is defined as a sale where any Unlicensed Good is packaged with a

Licensed Article or where a Licensed Article appears to be sold as part of or in conjunction with any Unlicensed Good(s) within the same retail transaction.

Licensee agrees, as a material part of this Agreement, that the Licensed Articles authorized herein are intended to be sold and will only be sold to the general public, as finished goods, in the form approved by Licensor as provided in paragraph 13; and that the use of such Licensed Articles in combination with any other materials to form a new - or combination - Product (or new version of the Licensed Articles) is hereby strictly prohibited. Licensee agrees to notify Licensor of any instances brought to its attention, or which it discovers, wherein the Licensed Articles are used in combination with other materials to form a new product or new version, and agrees that it will not itself produce or participate in the manufacture, distribution or sale of any such new product or new version.

12. <u>Materials Supplied</u>. Licensor shall make available to Licensee free of charge the photographic material and artwork with respect to the Licensed Property which is in Licensor's possession or direct control including Agent's Stylebook ("Materials") showing the Licensed Property. If a Licensee specifically requests new or additional Materials not within Licensor's possession or direct control, then Licensee shall bear all costs of creating, preparing, duplicating and shipping such new or additional Materials. All Materials, and all copyrights, trademarks and service marks in Materials, shall remain the exclusive property of Licensor or its Agent.

Licensee is required to use the Materials and/or its own creative talent to design, develop, draft or otherwise prepare all artwork for the Licensed Articles. Licensee is strictly prohibited from copying or otherwise duplicating artwork from any other articles produced pursuant to licenses which Licensor has granted to other licensees; and Licensee is strictly prohibited from infringing upon any copyrights, either statutory or common law, which other licensees, such as LJN Toys, Ltd., have secured for their artwork and/or their licensed articles. Licensor warrants that any Materials provided to Licensee by Licensor shall not infringe upon any copyrights, either statutory or common law or rights of any third parties.

13. <u>Approvals</u>. The quality and style of all Licensed Articles, artwork, packaging and wrapping material, cartons, containers, tags, labels and all other devices used in connection therewith and all advertising, promotional and display material for the Licensed Articles issued by or under the direct control of Licensee shall be subject to the prior written approval of Licensor. Licensee shall submit the preliminary design and final design of each of these items to Agent at the address listed in the Notices Paragraph. In addition and at the same time, Licensee shall submit to Licensor at the address listed in the Notices Paragraph hereof, a duplicate set of that which is submitted to Agent. No approval shall be given unless a completed Quality Review Form is

submitted with each Licensed Article tendered for approval.
Licensor and Agent will not unreasonably withhold their approval.
Any submission will be deemed approved if not approved with
fourteen (14) business days of receipt by Licensor. It is
understood that Licensor will review for final approval the
Licensed Articles prior to its shipment by Licensee for
manufacturing by Licensee's manufacturing agent (which in the first
instance is Nintendo). Licensee hereby represents and warrants that
the manufacturing agent (in the first instance Nintendo) will not
in any way materially change, alter or modify the Licensed Article
after it has received final approval as above.

In no event shall Licensee manufacture, solicit orders,
distribute or sell the Licensed Articles until such time as it
obtains the Licensor's requisite approval pursuant to this
Paragraph 13; or, if there is a dispute as to the reasonableness of
Licensor's withholding such approval, until such time as the
dispute between Licensor and Licensee as to withholding approval is
resolved by arbitration in accordance with provisions of
Paragraph 37.

14. Samples. Prior to distribution or sale of each Licensed
Article, Licensee shall furnish and ship free of charge to
Agent six (6) samples of each such Licensed Article, including
packaging, and shall furnish and ship free of charge a like amount
directly to Licensor, Attention Vice-President, Business Affairs.
(Licensee shall thereafter furnish Agent with documents indicating
proof of such shipment within fourteen (14) business days.) In
addition, Licensee shall furnish Agent with six (6) samples of all
advertising, catalogues, promotional and display material involving
or related to such Licensed Article.

15. Inspection. In connection with Licensee's premises,
Licensee shall allow Licensor, Agent or their designees to enter
Licensee's premises during regular business hours upon reasonable
prior notice for the purpose of inspecting the Licensed Articles.
~~and the facilities in which the Licensed Articles are manufactured~~
~~and packaged.~~

Licensee does hereby represent and warrant that it does not
have any right to inspect the manufacturing facilities where the
Licensed Articles are manufactured (which in the first instance is
Nintendo). In the event that Licensee has or acquires such rights,
Licensor's right to inspect such shall be co-equal with those of
Licensee.

Notwithstanding the foregoing, if quality standards are not
maintained throughout the period of manufacture of any Licensed
Articles, then upon written notice by either Licensor or Agent,
Licensee shall immediately discontinue or shall cause to be
discontinued the manufacture and distribution of Licensed Articles
which do not meet quality standards.

16. Buy-Back Provision. Licensee shall sell Licensor the
Licensed Articles in such reasonable quantities as Licensor

requests (if such Product is available) at a price ten percent (10%) above licensee's manufacturing cost it being understood that such Licensed Articles so bought by Licensor shall not be for resale.

17. Licensed Termination. During the last three (3) months of the Licensed Term, Licensee shall not manufacture Licensed Articles in excess of those manufactured for comparable periods during earlier years unless to fill orders actually received or reasonably anticipated.

Upon expiration or earlier termination of the Licensed Term (or any extension thereof), and provided Licensee is not then in material breach of this Agreement, Licensee may sell any Licensed Articles, which are either on hand or in process of manufacture at the time of termination, for a period of four (4) months after such expiration or termination (the "Sell-off Period") at no less than market value.

Royalties shall be due on all Licensed Articles shipped and sold during the Sell-off Period and shall be reported and paid according to Paragraph 7 above. Upon the expiration of the Sell-off Period, Licensee shall destroy (and shall take all necessary steps to ensure that the manufacturer of the Licensed Articles has so destroyed) that portion of the Source or Program Code which the Licensed Property [including but not limited to uses or depicts Licensor's copyrights, trademarks (including names, likenesses, voice, etc. of any Licensor wrestling personality) or concepts] is used in the production of the Licensed Articles. Additionally, at Licensor's option, Licensee shall either destroy its then remaining inventory of Licensed Articles and give Licensor satisfactory evidence of such destruction; or sell such remaining inventory to Licensor at Licensee's direct cost of manufacture. Upon the expiration of the Sell-off Period, Licensee shall have no further rights hereunder and shall give Licensor a complete accounting of the Licensed Articles remaining in distribution, and further, shall terminate or assign to Licensor, as Licensor may determine in its discretion, any remaining authorized distribution contracts. All Royalties due under such contracts shall thereafter be sent to Agent.

18. Payments and Statements. Within sixty (60) days after the initial shipment of any Licensed Article, and promptly on the sixtieth (60th) day of each calendar quarter after any such shipment, Licensee will furnish to Agent complete and accurate statements ("Statements"), showing the Licensed Articles shipped by Licensee, or any parent, affiliate or subsidiary of Licensee during the preceding calendar quarter ("Reporting Period"). Each Statement will identify for such Licensed Articles:

(i)     The actual selling price of such Licensed Articles, and

(ii)    The quantity, product identification number and description of such Licensed Articles as described in Exhibit A(7) together with any returns made or discounts taken during such Reporting Period.

-7-

Notwithstanding the foregoing, Licensee shall have the right to maintain a reserve of ten percent (10%) of the Royalties (non-cumulative) payable in each Quarter against permitted returns, each of which reserves shall be liquidated in the third (3rd) Quarter after the Quarter in which such reserve was taken. No such reserve shall be taken in the final three (3) Quarters of the Term.

The Royalties due for each Reporting Period shall be paid at the time the Statement is rendered to the Agent. All payments not made within ten (10) days of the date due shall be subject to interest at the rate of two percent (2%) over the then advertised prime rate charged by the Chemical Bank in New York until paid in full. Agent represents that it must pay a penalty to Licensor for *such* such late payment. The acceptance by Agent of any incomplete or late Statement or payment shall not be a waiver of Agent's right to *pay* demand that later Statements and payments be complete and timely made. The acceptance by Agent of any Statement or payment shall not constitute acceptance as to the accuracy of the statement and shall not be a waiver of Licensor's right to audit any Statement as provided herein. Notwithstanding any provision to the contrary contained herein, it is understood that all statements shall be deemed accurate at the end of the second calendar year from the date on which it was rendered unless Licensee shall have received notice of objection thereto within the aforementioned 2 calendar year period and Licensor shall have commenced an audit thereof within 90 days after the date of each notice.

(A)  Final Statement Upon Termination:  In the event of the termination (as opposed to the expiration) of the license granted hereunder, a statement showing the number and description of Licensed Articles on hand or in process shall be furnished by *on* Licensee to Licensor and Agent within ten (10) days after receipt of notice of termination. Licensor shall have the right to take a *pay* physical inventory to ascertain or verify such inventory and statement, and refusal by Licensee to submit to such physical inventory by Licensor shall forfeit Licensee's right to dispose of such inventory. Licensor shall retain all other legal and equitable rights Licensor may have in these circumstances.

(B)  Final Statement Prior to Expiration: Sixty (60) days before the expiration of this license, Licensee must furnish Licensor with a statement showing the number and description of Licensed Articles covered by this Agreement on hand or in process. Licensor shall have the right to take a physical inventory to ascertain or verify such inventory and statement, and refusal by Licensee to submit to such physical inventory by Licensor shall forfeit Licensee's right to dispose of such inventory, Licensor retaining all other legal and equitable rights Licensor may have in the circumstances.

19.  Currency Transmission.  All advances, guarantees, royalties or other amounts due Licensor under this Agreement shall be payable in freely transmittable United States currency, or in such other currency at such other depository as Agent may advise Licensee from time to time. All payments shall be made to Agent,

-8-

at the address for notice listed herein. All payments shall be net of all taxes, import duties, other governmental charges, currency transmission costs, bank charges, and permit fees, all of which must be paid by Licensee and may not be deducted from any sums due Licensor.

20. Records and Audit. ~~Until at least two (2) years after the Licensed Term, or any extension thereof,~~ Licensee shall keep complete and accurate books and records at its principal place of business covering all transactions relating to the rights granted under this Agreement for a period of 2 years after rendering any such statement. The books and records shall include, but not be limited to, invoices, shipping records, correspondence and the information required on each Statement. During regular business hours, upon reasonable notice, Licensor, Agent, or their designees shall have the right to examine and copy, without unreasonable interference by Licensee, all of Licensee's books and records as such pertain to the sale of Licensed Articles along with all other materials under the control of Licensee in connection with the rights granted under this Agreement. Upon demand by Agent, but not more than once each year during the Licensed Term, Licensee shall at its own expense furnish to Agent a detailed statement by an officer of Licensee showing pricing information, and the number and description of the Licensed Articles shipped and sold by Licensee up to the date of Agent's demand. If any audit reveals that Licensee has underpaid any sums due Agent, Licensee shall pay such sums to Agent immediately upon completion of the audit, along with applicable late charges and interest as provided in Paragraph 18. If the amount of any underpayment is more than five percent (5%) of the amount found due, Licensee, in addition to the payment of the amount due and owing as prior underpayment, shall pay Licensor or Agent, as the case may be, all reasonable costs of audit.

21. Assignment of Rights. Licensee assigns to Licensor all copyrights, rights to ideas, and related intellectual property rights in any work created by Licensee utilizing the Licensed Property; and Licensee waives and releases in favor of Licensor any "moral rights" or other personality rights in such works.

All work utilizing the Licensed Property shall be prepared only by Licensee's employees-for-hire or on a work-for-hire basis, as the case may be, and upon the request of Licensor, Licensee and its employees-for-hire shall execute, acknowledge and deliver documentation satisfactory to Licensor confirming the foregoing assignment, waiver and release of all their rights to any work utilizing the Licensed Property. If Licensee fails to promptly sign such documentation, Licensor shall have the right to execute and record such documentation as Licensee's attorney-in-fact and Licensee appoints Licensor its lawful attorney-in-fact for the purpose of executing such documentation. The rights of Licensor under this Paragraph constitute a power coupled with an interest and are irrevocable.

Notwithstanding anything to the contrary herein, it is understood and agreed that as between Licensor and Licensee

or Contractor as the case may be,

or by an independent contractor employed by Acclaim ("Contractor")

copyright interest in and to the software program itself shall belong to Licensee while Licensor shall retain all right, title and interest in and to the Licensed Property.

22. <u>Goodwill</u>. All rights in the Licensed Property other than those specifically granted in this Agreement are reserved to Licensor, and Licensor may exploit same in its sole discretion. Licensee recognizes the great value of the publicity and goodwill associated with the Licensed Property, acknowledges that all trademarks and service marks pertaining thereto or used in connection therewith have acquired secondary meaning in the minds of the public and agrees that such trademarks and service marks all rights and goodwill attendant to them belong exclusively to Licensor and that all use of the Licensed Property and such trademarks and service marks pursuant to this Agreement shall inure to the benefit of Licensor (or any grantor of Licensor's rights).

23. <u>Copyright, Trademark and Service Mark Notices</u>. Licensee shall abide by all copyright, trademark and service mark notices required by Licensor in connection with its use of the Licensed Property. The following notices must be permanently affixed in a reasonably prominent position at least once on all Licensed Articles and on all labels, packaging, advertising, promotional and display materials used in connection with each Licensed Article:

"c. 19__ Titan Sports, Inc. Hulk Hogan$^R$ is a trademark of the Marvel Comics Group licensed exclusively to Titan Sports, Inc. All other distinctive names and character likenesses used herein are trademarks of Titan Sports, Inc. All Rights Reserved."

The above notice and designation shall be confirmed by Agent and are subject to change by Licensor at any time prior to the manufacture of Licensed Articles, and Licensee shall make all reasonable efforts to comply with such changes. However, if space and/or aesthetics make use of the legend above unworkable, then Licensee has the right to request an abbreviated alternative. Such modifications shall be discussed with Agent and must be approved before they can be applied to any Licensed Article.

(A) <u>"Hulk" Articles</u>. Notwithstanding anything contained in paragraph 23 above, it is agreed that to the extent any Licensed Articles utilize, alone or with other items, either the words "Hulk Hogan", "Hulkamania" or "Hulkster", or the caricature or likeness of Hulk Hogan$^R$ (collectively called the "Hulk Articles"). Licensee agrees to comply with all of the following:

(i)    Any copyright and/or trademark notices in connection with any Hulk Articles shall be in a form and in the name as designated by Licensor and if separate trademark or copyright notices are required in connection with any individual such uses, separate notices must be utilized. In addition, Licensee agrees to cooperate in any efforts required or any copyright or trademark registration to be done by Licensor or any grantor of Licensor's rights;

(ii)    Licensee will not in any event use the word "incredible" in connection with any Hulk Articles;

(iii)   Licensee agrees that when the word "Hulk" is used it will be used with the word "Hogan" and that when used together "Hulk" may not be more prominent than "Hogan";

(iv)    Licensee will not use the colors green and purple in connection with Hulk Articles.

(B)    Licensee's Cooperation on Copyrights, Trademarks and Service Marks.  Subject to the provisions of Paragraph 21, Licensee agrees to cooperate fully and in good faith (but without out of pocket expenditures) with Licensor for the purpose of securing and preserving Licensor's (or any grantor of Licensor's) rights in and to the Licensed Property and any copyrights, trademarks, service marks, pertaining thereto or used in connection therewith. Subject to the above, Licensee shall register for copyright in Licensee's name the Licensed Articles manufactured, sold or distributed by Licensee hereunder and any advertising or other materials relating thereto; and Licensor may register the Licensed Property as a trademark and/or service mark for such Licensed Articles in the appropriate class in the name of Licensor (provided there has not been in effect any prior registration of the Licensed Property for such purpose in such classes in the respective country) in each country in which the Licensed Articles are sold or offered for sale hereunder, as soon as Licensor or Licensee is entitled to make or file such registrations in each such country; and ~~Licensee~~ shall take any and all other steps at ~~Licensee's~~ cost required to secure and all other steps required to secure such copyright, trademark or service mark protection in each such country. ~~If Licensee fails to file the appropriate copyright, trademark and/or service mark registrations within 90 days after an article is in commerce, then Licensee will pay Licensor its reasonable fees to file such registration.~~

It is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to Licensee of any right, title, or interest in or to the Licensed Property except as otherwise expressly set forth herein; it being understood that all rights relating thereto are reserved by Licensor except for the license granted hereunder to Licensee. Licensee agrees that at the expiration or termination of this Agreement for any reason, Licensee will be deemed automatically to have assigned, transferred, and conveyed to Licensor any and all copyrights, trademark or service mark rights, equities, good will, or other right, title or interest in and to the Licensed Property which may have been obtained by Licensee or which may have vested in Licensee pursuant to any endeavors covered hereby; and that Licensee shall execute, and hereby irrevocably appoints Licensor the attorney-in-fact to execute (if Licensee refuses to do so within a reasonable time after Licensor's written request) any instruments requested by Licensor to accomplish or confirm the foregoing.  Any such assignment, transfer, or conveyance shall be without consideration other than the mutual covenants and considerations of

-11-

this Agreement. If an infringement or imitation of the Licensed Property shall come to Licensae's attention, Licensee shall promptly notify Licensor thereof. As between Licensor and Licensee, Licensor shall have the sole right to determine whether or not any demand, suit or other action relating to the Licensed Property shall be taken on account of or with reference to any infringements or imitations of the Licensed Property provided, however, that Licensee shall cooperate fully with Licensor in any manner that Licensor may reasonably request.

(C)  It is understood that certain elements from the animated television series "Hulk Hogan's Rock 'N' Wrestling" are the trademarked property of Licensor and Agent. Licensee shall be so notified of such elements and agrees to affix to the Licensed Articles the appropriate notice with respect to such jointly owned elements.

24.  Licensor's Warranties and Representations. Licensor represents and warrants to Licensee that as between Licensor and Licensee:

(i)  Licensor has the right to license the Licensed Property to Licensee in accordance with the terms of this Agreement; and

(ii)  The Licensed Property does not infringe any copyright, trademark, service mark, literary or other intellectual property right of any third party.

Licensor makes no warranty or representation as to the amount of gross sales, net sales, or profits, if any, Licensee may derive from the exercise of any rights licensed under this Agreement; and Licensee hereby absolutely and unequivocally disclaims any reliance on any information furnished by Licensor to Licensee with respect to any gross sales, net sales, or profits derived from the use of the Licensed Property with any and all articles of every kind and nature.

25.  Licensor's Indemnity. Licensor shall indemnify and hold harmless Licensee, and its officers, directors, employees and agents from all claims, demands, causes of action, costs (including reasonable attorney's fees), and judgments arising out of the breach of Licensor of the warranties and representations set forth herein. Licensee shall assist Licensor, at Licensor's expense, and to the extent necessary, in protecting any of Licensor's rights in the Licensed Property, and Licensor, if it so desires, may prosecute any claims in its own name or join Licensee as a party in such claim. Licensee shall notify Agent in writing of any infringement of the Licensed Property ~~of which they become aware~~ or of which they become aware any imitation of the Licensed Property or the Licensed Articles. Licensor's prior approval of usage of marks, symbols or likenesses shall not affect this right to indemnification as to such usage.

Licensor will have the sole right to determine whether any action should be taken on account of any such infringements or

imitations. Licensee shall not take any action on account of any such infringements or imitations without first obtaining the written consent of Licensor.

26. <u>Licensee's Indemnity</u>. Licensee shall indemnify and hold harmless Licensor, Agent, their subsidiaries, affiliates and co-venturers and the officers, directors, employees, agents and sub-agents of each of them, from any claims, losses, liabilities, damages, costs (including reasonable attorneys' fees) suits of judgments arising out of any use, manufacture, distribution, sale or exploitation of any Licensed Articles; the use or consumption of any such Licensed Articles; and any breach of any term, covenant, and condition of this Agreement.

27. <u>Product Liability Insurance</u>. Licensee shall maintain throughout the Licensed Term at its sole expense a standard product liability insurance policy from a qualified insurance company acceptable to Licensor, which names as additional insureds: Licensor and Agent, their subsidiaries and affiliated companies, including all directors, officers, employees, agents, sub-agents and representatives. The policy shall provide full indemnification and defense against any claims, liabilities, demands and causes of action arising out of any defects in reasonably foreseeable use or misuse of the Licensed Articles. Coverage shall be a minimum of One Million Dollars ($1,000,000.00)(U.S.) for bodily injury and One Million Dollars ($1,000,000.00)(U.S.) for property damage. Licensee shall furnish Agent and Licensor each with a certified copy of the policy providing such coverage within thirty (30) days after the date of this Agreement.

Licensee shall not manufacture, distribute or sell any Licensed Article before receipt by Agent and Licensor of such evidence of insurance. Such insurance may not be amended, modified or terminated without prior written consent of Licensor.

28. <u>Specific Undertakings of Licensee</u>. During the Licensed Term Licensee:

   (i)   Shall not attack the title of the Licensor to any and all copyrights, trademarks and service marks pertaining to or used in connection with the Licensed Property, as well as any publicity or other intellectual property rights in the Licensed Property, or the validity of the license granted in this Agreement;

   (ii)  Shall not harm, misuse or portray in a derogatory manner the Licensed Property;

   (iii) Shall manufacture, sell and distribute the Licensed Articles in accordance with the terms and conditions of this Agreement and in conformity with applicable federal, state or local laws or regulations;

   (iv)  Shall not create any expenses chargeable to Licensor or Agent without such party's prior written approval;

-13-

(v)   Shall protect to the best of its ability its right to manufacture, sell and distribute the Licensed Articles; and

(vi)   Shall comply with all laws and regulations relating to the manufacture, sale, advertising and use of the Licensed Articles.

29. <u>Restrictions on Assignment or Sublicensing</u>. The rights granted in this Agreement are personal to Licensee, and may not be assigned by Licensee or by operation of law except an assignment in connection with a sale of all or substantially all of stock or assets of Licensee or an assignment to a Corporation controlled by Gregory E. Fischbach or James ~~Scorposhi~~ provided however in all such cases Licensee shall remain secondly liable for all Licensee's obligations hereunder notwithstanding such assignment. Licensee may not grant any sublicenses or allow any third party to manufacture any Licensed Articles without first obtaining the prior written approval of (Agent) All proposed sublicensees must enter into a separate merchandising agreement with Licensor.

_Scorposki_

30. <u>Events of Default</u>. Events of Default shall include, but not be limited to, the following:

(i)   If Licensee fails to make any payment to Licensor or Agent when due; or

(ii)   If Licensee fails to deliver and maintain the insurance provided above; or

(iii)   If Licensee fails to deliver any Statements when due, fails to maintain complete and accurate books and records, or fails to give access to the premises to Licensor and its authorized representatives for purposes permitted under ~~permitted under~~ this Agreement; or

(iv)   If Licensee fails to abide by any material term, covenant, or condition of this Agreement; or

(v)   If any governmental agency finds that the Licensed Articles are defective in any way and as a result Licensee is not permitted to sell the Licensed Articles and such defect cannot be cured within a reasonable period of time; or

(vi)   If Licensee is unable to pay its debts when due, or makes any general assignment for the benefit of creditors, or files any voluntary petition for relief under any bankruptcy or insolvency laws of any jurisdiction, or has a receiver or trustee appointed for its business or property who is not removed within thirty (30) days of appointment; or

(vii)   If Licensee does not commence in good faith to manufacture, distribute and sell the Licensed Articles

throughout the Licensed Territory on or before the Marketing Date; or

(viii) If Licensee fails to comply with the material procedures to obtain product approvals as provided in Paragraph 13 herein; or

(ix) If Licensee manufactures, solicits orders, distributes or sells any Licensed Articles without first obtaining the requisite approval pursuant to Paragraph 13.

If Licensor becomes aware of any Event of Default, Licensor shall give written notice of such Event of Default to Licensee. Licensee will then have fifteen (15) days, in case of a monetary default, and thirty (30) days, in case of a non-monetary default, to cure such Event of Default. If Licensee fails to do so within the time provided, then Licensor may pursue its available remedies hereunder including, but not limited to, the right to terminate this Agreement.

31. **Termination Upon Default**. If Licensee is in Default and does not cure within the time periods set forth in Paragraph 30, then upon the expiration of such time periods the Licensor shall have the right to terminate this Agreement immediately upon giving written notice to Licensee; provided, however, that if the Default is a breach of the requirements of Paragraph 30(vii), Licensor shall have the election of terminating this entire Agreement, or terminating this Agreement only with respect to the specific Licensed Article and/or the specific territory for which Licensee has not commenced good faith marketing efforts.

Upon the expiration or termination of this Agreement, or any part of it, all rights to use the Licensed Property and Licensed Articles shall revert automatically to Licensor, with regard to the whole or the part terminated and Licensee shall immediately discontinue use of all such Licensed Property and the manufacture, distribution and sale of Licensed Articles.

Licensee shall destroy the source or program code utilizing the Licensed Property used in the production of the Licensed Articles and shall furnish evidence of such destruction. Licensor shall have the option of purchasing all or a portion of Licensee's remaining inventory of Licensed Articles (but shall delete Licensee's name or logo) at Licensee's direct cost of manufacture, and all remaining inventory not purchased by Licensor shall be destroyed by Licensee. Licensee shall give to Licensor satisfactory evidence of such destruction.

Notwithstanding any termination of this Agreement pursuant to this Paragraph 31, the provisions of Paragraphs 7, 8, 9, 18, 19, 20, 21, 22 and 26 shall survive such termination.

32. **Remedies Cumulative**. In case any Event of Default is not timely cured as provided herein, Licensor, in addition to its right of termination as provided above, shall have the right to pursue

all appropriate remedies in law or in equity for such uncured Event of Default. In this regard, Licensee acknowledges that a breach by Licensee of this Agreement shall cause Licensor irreparable damages which may not be adequately measured by monetary relief, and Licensee agrees that in case of such breach Licensor, in addition to other remedies, shall be entitled to an injunction and other appropriate equitable resort to one remedy shall not waive resort to another remedy or the same remedy at a later time. No waiver by Licensor of any term, covenant or condition of this Agreement shall be deemed a waiver of any other term, covenant, or condition, and Licensor's forbearance to enforce any right or remedy shall not be a waiver of Licensor's right to enforce the same right or remedy for later breaches.

33. <u>Limitations on Liability and Damages</u>. No party to this Agreement shall be liable in contract or in tort (including negligence) or under any other legal theory to any other party for any breach of any statutory, common law or other legally implied obligations, whatsoever; and no party shall be liable to any other party for any indirect, incidental or consequential damages, including, without limitation, cost of capital, loss of earnings, loss of profits, loss of business, or loss of advantages commercial and financial opportunities, personal injury, third party claims, or any fines or penalties assessed for failure to comply with any law or governmental rule or regulation arising from the breach or non-performance of any obligation set forth in this Agreement. However, notwithstanding the foregoing, if Licensee or Licensor, as the case may be shall repudiate, abandon or refuse to continue to work under this Agreement; then Licensor shall not be precluded by this Paragraph 33 from seeking and recovering any and all damages it incurs as a result of such repudiation, abandonment, refusal to continue work, or default.

34. <u>Notices</u>. All notices or other communications required or desired to be sent to Licensor, Agent, or Licensee shall be in writing and shall be sent by Registered or Certified Mail, postage prepaid, return receipt requested, or sent by telegram, charges prepaid to the address indicated below:

TO LICENSOR:     TITAN SPORTS, INC.
1055 Summer Street, P.O. 3857
Stamford, Connecticut 06905
USA
Attn: Dick Glover, Vice-President

TO AGENT:     DIC MERCHANDISING ENTERPRISES, INC.
3601 W. Olive Avenue
Burbank, California 91505 USA
Attn: Sidney A. Kaufman
       Vice President Licensing

CC:     DIC MERCHANDISING ENTERPRISES, INC.
3601 W. Olive Avenue
Burbank, California 91505 USA
Attn: Gregory B. Payne, Esq.

```
TO LICENSEE:        ACCLAIM ENTERTAINMENT, INC.
                    189 South Street
                    Oyster Bay, NY  11771
                    Attn:  Robert Holmes

CC:                 Bernard J. Fischbach, Esq.
                    FISCHBACH, MEDOW & PERLSTEIN
                    1925 Century Park East
                    Suite 1250
                    Los Angeles, California  90067
```

35. <u>Reservation of Rights</u>.  It is agreed and understood that Licensor reserves unto itself all rights not specifically and exclusively granted herein and may exploit same in its sole discretion.

36. <u>No Joint Venture</u>.  Nothing herein contained shall be construed to place the parties in any partnership or joint venture relationship; and Licensee shall have no power to obligate or bind Licensor in any manner whatsoever.

37. <u>Arbitration</u>.  In the event that there is any claim, dispute, or other matter in question arising out of or relating to, this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the American Arbitration Association for hearing in New York, New York; and any such claim, dispute or other matter in question shall be decided, in accordance with the Rules of the American Arbitration Association, by a duly appointed Arbitrator who shall render his decision in the form of an award.  This provision to arbitrate shall be specifically enforceable under the prevailing Connecticut Arbitration laws, and each party, hereby waiving personal Service of Process and Venue, consents to jurisdiction in ~~Connecticut~~ for — New York purposes of any other party securing such specific enforcement.

Any arbitration award shall be final and judgment shall be entered thereon by any court having jurisdiction thereof.

All Notices of Claim or any other process required to initiate arbitration or specifically enforce this arbitration provision may be served by certified or registered mail directed to any party or its agent at the address set forth in Paragraph 34 and such service by mail shall be of the same force and effect as if such Notice or other process had been personally served within Stamford, Connecticut.

In the event that any legal action or any other proceeding is commenced to enforce any provision of this Agreement or as a result of a dispute, breach, default or misrepresentation in conjunction with this Agreement, the successful or prevailing party in arbitration shall be entitled, in addition to any other relief, to recover all costs of arbitration, including expert fees, as well as all reasonable attorneys' fees incurred in such action or proceeding; and all such relief including costs and fees shall be part of the award.

Notwithstanding the foregoing, Licensor may seek injunctive relief and damages in any court of competent jurisdiction for claims arising under the Lanham (federal trademark) Act, Copyright Act and state law of unfair competition or similar statutes, when Licensor believes that Licensee's actions with respect to usage of Licensor's trademarks, tradenames, service marks, copyrights or likenesses of its wrestlers or their managers, is causing or is likely to cause Licensor irreparable injury.

38. <u>Entire Agreement</u>. This Agreement contains the full and complete understanding between the parties and supersedes all prior understandings, whether written or oral, pertaining to the subject matter hereof. The parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement; and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

This Agreement cannot be amended, modified or altered except by a written instrument signed by the parties hereto.

In the event that any party seeks a waiver of any part or portion of this Agreement, such waiver must be by written instrument signed by the party waiving compliance. The failure of any party at any time to require performance of any Provision in this Agreement shall in no manner affect his right at a later time to enforce the same. And, no waiver by either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach or a waiver of the breach of any other term or covenant contained in this Agreement.

39. <u>Exhibits</u>. All exhibits shall be deemed part of this Agreement.

40. <u>Headings</u>. The headings herein are for reference only and shall not affect the construction of this Agreement.

41. <u>Severability</u>. The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, and all of the provisions being inserted conditionally on their being considered legally valid, and this Agreement shall be construed and performed in all respects as if such invalid or unenforceable provision(s) were omitted.

42. <u>Governing Law</u>. This Agreement, its validity, construction and effect shall be governed by and construed under the internal laws of the State of Connecticut.

43. <u>Execution</u>. Subject to revisions agreed to between the parties, if this Agreement is not executed by Licensee and returned to Agent within ~~fifteen (15)~~ business days of mailing to Licensee by Agent, then this Agreement shall be automatically terminated, and Licensee shall have no rights hereunder. twenty (20)

-18-

IN WITNESS WHEREOF, the parties have executed this Agreement as at the date first written above.

LICENSOR:                                    AGENT:

TITAN SPORTS, INC.                           DIC MERCHANDISING ENTERPRISES, INC.

By: _Richard K. Glen_____                    By: _Gregory B Payne_____

Its: _Sr VP Bus Aff_____                     Its: _Sr Legal Counsel_____


                                             ACCLAIM ENTERTAINMENT, INC.


                                             By: _Robert Oliver_____

                                             Its: _Sr VP_____

This is Exhibit A to the accompanying Merchandising License Agreement between TITAN SPORTS, INC. ("Licensor"), as represented by its agent DIC MERCHANDISING ENTERPRISES, INC. ("Agent") and ACCLAIM ENTERTAINMENT, INC. ("Licensee").

The information contained in this Exhibit A serves to complete the corresponding references in the Merchandising License Agreement and together therewith constitute part of such Agreement. THIS PAGE ALONE DOES NOT CONSTITUTE AN AGREEMENT.

## LICENSING AGREEMENT TERM

1. Property: **World Wrestling Federation and Hulk Hogan's Rock `N' Wrestling**

2. Licensee: ACCLAIM ENTERTAINMENT, INC.

3. Address: 189 South Street
   Oyster Bay, NY 11771

4. Contact: Robert Holmes    5. Phone No. 516-922-2400

6. Contract No: N/A

7. Licensed Articles: Game software for Nintendo, Sega and Atari Video Systems only and ⓐ

8. Term of License Agreement – From: March 17, 1988
                              To:   March 17, 1991

9. Product Marketing Date: February 1, 1989

10. Territory: World

11. Advance: Non-refundable $150,000 Advance payable as follows:

    --25% previously paid and receipt acknowledged.

    --25% upon signature of a formal agreement

    --50% November 15, 1988.

12. Guarantee: None – other than the payment of the Advance

13. Royalty Rate: ( i) $ .90 per unit; or

    (ii) $.45 per ~~Nintendo, Sega and Atari~~ handheld unit

ⓐ Handheld interactive computer games

**14.** (i) Extension Option Granted: _X_ yes____ no (Place an "X" as appropriate)

   (ii) Extension Option Advance: _None_

   (iii) Extension Option Guarantee: _None_

**15.   Distribution:**     DIC and Titan are entering this agreement with the understanding and expectation that Acclaim has in place a retail toy store distribution network. Should Titan and DIC in their reasonable judgement, exercised in good faith, determine that a substantial retail toy sales network has not been established, DIC and Titan shall so notify Acclaim, where upon Acclaim shall have 60 days thereof to cure the breach.

**16.   Advertising:**     Acclaim guarantees Titan & DIC Merchandising that a minimum of $500,000 will be spent in promotion and advertising (including cooperative advertising of the Licensed Articles). Acclaim also guarantees that part of this advertising will be in the form of television commercials.

 
January 25, 1990

Mr. Robert Holmes
ACCLAIM ENTERTAINMENT
189 South Street
Oyster Bay, NY 11771

Dear Mr. Holmes:

This letter will serve as an amendment to the License Agreement between Titan Sports, Inc. ("Licensor") and Acclaim Entertainment ("Licensee") dated March 17, 1988, covering the World Wrestling Federation Property as described in Exhibit A annexed thereto.

1.) It is hereby agreed by Licensor and Licensee that the following is added to <u>Exhibit A, 7. Licensed Articles</u> on page 20:

"and Game Software for the Nintendo Game Boy [TM] System."

2.) The following is added to <u>Exhibit A, 12. Royalty Rate</u> on page 16:

"(iii) $ .65 per Game Boy [TM] game cartridge."

Except as herein above provided, the terms and conditions of the subject License Agreement are hereby ratified and confirmed.

Executed this _13th_ day of _Feb_____, 1990.

Titan Sports, Inc.
("Licensor")

By: _____

Acclaim Entertainment ("Licensee")

By: _____

Leisure Concepts, Inc.
("Agent")

By: _____

# AMENDMENT TO AGREEMENT

This Amendment is entered into as of this |5|st day of May, 1991, by and between Titan Sports, Inc. ("Licensor") and Acclaim Entertainment, Inc. ("Licensee") with reference to that certain agreement previously entered into between Licensor and Licensee as of March 17, 1988, as amended and extended (the"Agreement").

Notwithstanding anything contained in the Agreement to the contrary, Licensor and Licensee hereby agree to amend the Agreement as follows:

1. Exhibit A (7) of the Agreement is hereby amended to add the following items as Licensed Articles: "Computer game software for home computers for the following systems: IBM, Commodore, Apple, Tandy, Atari (and all of their respective compatibles) and CD Rom (hereinafter the "PC Licensed Articles").

2. Exhibit A (8) of the Agreement is hereby amended to add the following: "The Term of the License Agreement for the PC Licensed Articles shall be from May 1, 1991 to and including December 31, 1994 and the Extension Term of the License Agreement for the PC Licensed Articles shall be from January 1,1995 to and including December 31, 1995."

3. Exhibit A (9) of the Agreement is hereby amended to add the following: "The Product Marketing Date for the PC Licensed Articles is October 1, 1992."

4. Exhibit A (10) of the Agreement is hereby amended to add the following: "The Territory with respect to the PC Licensed Articles shall be: the United States, its territories and possessions, Canada, Mexico, South America, Japan, Korea, the Middle Eastern Countries and all Eastern Block countries in Europe."

5. Exhibit A (11) of the Agreement is hereby amended to add the following: "The Advance with respect to the PC Licensed Articles is Twenty-Five Thousand ($25,000) Dollars, payable upon the full execution of this Amendment to Agreement."

6. Exhibit A (12) of the Agreement is hereby amended to add the following: "The Guarantee with respect to the PC Licensed Articles is Fifty Thousand ($50,000) Dollars. The Advance paid pursuant to Exhibit A (11) of the Agreement, as amended, will be an initial payment of the Guarantee with respect to the PC Licensed Articles. If by the termination or expiration of the Initial Term for the PC Licensed Articles, Licensor has not received Royalties from the PC Licensed Articles at least equal to the Guarantee with respect to the PC Licensed Articles, then Licensee shall immediately pay Licensor the difference between the Royalties with respect to the PC Licensed Articles actually

Except as may be noted herein, the capitalized terms shall have the same meaning and effect as set forth and defined in the Agreement.   In all other respects the Agreement is hereby ratified and confirmed.

Agreed to and Accepted:

TITAN SPORTS, INC.

By: _____

Agreed to and Accepted:

ACCLAIM ENTERTAINMENT, INC.

By: _____

Agreed to and Accepted:

LEISURE CONCEPTS, INC.

By: _____

as agent for Titan Sports, Inc.

# AMENDMENT TO AGREEMENT

This Amendment is entered into as of this 21st day of April, 1993, by and between **Titan Sports, Inc.** ("Licensor") and **Acclaim Entertainment, Inc.** ("Licensee") with reference to that certain agreement previously entered into between Licensor and Licensee as of March 17, 1988, as such agreement has been previously amended and extended (the"Agreement"). Notwithstanding anything contained in the Agreement to the contrary, Licensor and Licensee hereby agree to amend the Agreement as follows:

1.(a)  Paragraph 2 of the Agreement is hereby amended to add the following as subpart (iv):

"(iv) To the extent that any wrestler's services, including without limitation Hulk Hogan, are contractually available to Licensor and there are no business reasons that would, in the reasonable discretion of Licensor exercised in good faith (for example, and only for example, mortal turpitude or the commission of a crime or felony), preclude such wrestler's inclusion in any Licensed Article, Licensee shall be entitled to utilize such wrestler and the related intellectual property in such Licensed Articles."

(b)  Paragraphs 2 (iii) and 23 (C) of the Agreement are hereby deleted provided that it is understood that (i) Licensor shall not have the right to grant to any other party the right to manufacture Licensed Articles embodying any of the names, likenesses, physical characteristics etc. set forth in either of the above referenced paragraphs; (ii) that if the now canceled animated television series "Hulk Hogan's Rock 'N' Wrestling (the "Series") is hereafter reinstated as a television series then the Agreement will be deemed to have been amended to again include paragraphs 2 (iii) and 23 (C); and (iii) that notwithstanding the deletion of the above referenced paragraphs, Licensee shall nevertheless have the right to use the names, likenesses, physical characteristics of any wrestlers which were portrayed in the series as Licensee otherwise would have pursuant to the terms of the Agreement as amended.

2. Exhibit A (7) of the Agreement, as amended, and paragraph 1 of the amendment to the Agreement dated May 1, 1991 (the "May Amendment") are hereby deleted in their entirety and the following shall be substituted in its place: "Any and all computer software no matter in what storage mechanism such computer software is delivered (whether now known or hereafter devised including without limitation, storage mechanisms such as optical disc, compact discs, ROM Cartridges, cassettes, floppy disks and coin operated video arcade products) or whether such computer software is delivered via cable, over the air, by telephone wire or via any other electronic or digital delivery systems, whether now known or later devised.  Notwithstanding the foregoing to the contrary Licensed Articles shall not include

Dedicated Portable Machines or Interactive Magazines. The term "Dedicated Portable Machine" shall mean a Portable Machine which is not programmable. The term "Portable Machine" means an LCD type handheld video game machine similar to the type previously marketed and distributed by Licensee and which is not programmable. The term Interactive Magazine shall mean a printed type magazine embodied on computer software for use with computers containing not only printed text, static images but also video footage of prior events but shall not include any type of a video or role playing type game. Notwithstanding the provisions of paragraph 2, Licensor shall not be prohibited from exploiting current or future technology to produce and disseminate such Interactive Magazine.

3. Notwithstanding anything contained in paragraph 4, 10 , Exhibit A (8) of the Agreement, as amended, or paragraph 2 of the May Amendment the parties hereby agree to extend the Term of the Agreement to March 31, 1999 (the "Extended Term").

4.  Paragraph 9 and Exhibit A (12) of the Agreement, as amended, and paragraphs 6 and 8 of the May Amendment are hereby deleted. Licensee agrees to guarantee to pay Licensor the sum of Six Million ($6,000,000) Dollars (the "Guarantee") in Royalties (as such term is defined in the Agreement) from April 1, 1993 to the expiration of the Extended Term. If by the termination or expiration of the Extended Term, as specified in this amendment, Licensor has not received Royalties (inclusive of royalties payable from April 1, 1993) from Licensee at least equal to the Guarantee, then Licensee shall immediately pay Licensor the difference between the Royalties with respect to the Licensed Articles actually received by Licensor and the Guarantee with respect to the Licensed Articles. Any such amount so paid Licensor shall be deemed an advance recoupable by Licensee from any other sums thereafter due Licensor.

5.  The second sentence of paragraph 7 of the Agreement is hereby deleted. Exhibit A (13) of the Agreement, as amended, and paragraphs 7 and 9 of the May Amendment are hereby deleted in their entirety. The following shall be substituted in the place of Exhibit A (13) of the Agreement:

"Effective on all sales of the Licensed Articles embodying the Property after April 1, 1993, Licensee shall pay to Licensor the following royalties for the Licensed Articles in the following configurations:

(a)  (i) 8 Bit Cartridges - Ninety ($0.90) cents per unit sold.

(ii)      (1)  Super Cartridges sold in the United States five (5%) percent of Net Receipts.

(2)  Super Cartridges sold outside the United States four (4%) percent of Net Receipts.

(iii)   Portable ROM designed for the Nintendo Game Boy - Sixty cents ($.65) per unit sold.

(iv)   Portable ROM (other than those designed for the Nintendo Game Boy) - One Dollar ($1.00) per unit sold.

(v) Compact Disc Devices -Six (6%) percent of Net Receipts.

(vi) Magnetic floppy discs or cassettes for computers - Seven (7%) percent of Net Receipts.

(vii) Video Arcade Machines - Twenty-five ($25.00) Dollars per unit sold.

(viii) Video Arcade Conversion Kits - ($15.00) Dollars per unit sold.

(ix)   With respect to Licensed Articles for which a royalty is not provided for above and which are not in common use today (herein referred ro "New Technology Licensed Articles, the parties agree to negotiate in good faith with respect to a royalty for such New Technology Licensed Articles, provided that Licensee has first offered to Licensor the right and opportunity to negotiate royalties on any particular New Technology Licensed Article then nothing contained herein shall prevent Licensee from so distributing or exploiting such New Technology Licensed Articles prior to the parties reaching agreement with respect to such royalties.

The term "Compact Disc Devices" shall mean optical disc(s) (which includes, without limitation, "CD ROM", "CDI", compact disc, laser disc and any other type or kind of optical disc now known or hereafter devised).

The term "Portable ROM" means ROM cartridges, compact discs, floppy discs, cassette or any other storage mechanism now known or hereafter devised, designed to operate on a programmable Portable Console.

The term "Portable Console" means any device, whether now known or unknown, on or by which computer software and its associated visual images, with or without sound embodied or recorded for later operation, which such computer software embodying the Property can be perceived or otherwise communicated directly through the use of a so-called "portable console" that operates with or without batteries and contains a built in viewing screen (whether liquid crystal type or standard television tube), are designed solely for personal use and which may or may not be programmable.

The term "8 Bit Cartridge" shall mean a ROM Cartridge designed to be used with any 8 Bit video game machine (eg the NES or Sega

Master System) other than a Portable Console.

The term "Super Cartridge" shall mean a ROM Cartridge designed to be with used any video game machine excluding an 8 Bit video game machine and Portable Consoles (eg the Sega Genesis, the Super Nintendo Entertainment System, etc.).

The term "Video Arcade Conversion Kit" shall mean a replacement package for a Video Arcade Machine composed of computer software (whether in the form of an optical disc, ROM Cartridge or any other form) which computer software embodies a game.

The term "Net Receipts" shall mean all gross monies received by Licensee or credited to Licensee's account from the sale of (i) Licensed Articles in the form of Compact Disc Devices (when calculating royalties relating to the sale of Licensed Articles in the form of Compact Disc Devices), or (ii) Licensed Articles in the form of Magnetic floppy discs or cassettes (when calculating royalties relating to the sale of Licensed Articles in the form of magnetic floppy discs and cassettes) or (iii) Licensed Articles in the form of Super Cartridges (when calculating royalties relating to the sale of Licensed Articles in the form of Super Cartridges), less (y) any and all excise, sales, value added (net of input credit) or comparable or similar taxes and (z) returns, discounts or credits on account of the sale of such aforementioned Licensed Articles.
The term "Video Arcade Machine" shall mean a self contained stand alone unit embodying a computer and computer software which computer software embodies a game."

6. The following phrase is hereby added to the first paragraph of paragraph 18 (ii) of the Agreement after the word "number" on the first line thereof: "including the title and format of the Licensed Article". The second paragraph of paragraph 18 (ii) of the Agreement is hereby deleted and the following substituted in its place and stead:

"Notwithstanding the foregoing, Licensee shall have the right to maintain a reserve of ten percent (10%), of the Royalties (except 15 percent (15%) with respect to Royalties derived from the sale of Licensed Articles in the form of Compact Disc Devices) payable in each Quarter against returns, each of which reserves shall be liquidated in the fourth Quarter after the Quarter in which such reserve was taken."

7. Paragraph 34 of the Agreement is hereby deleted and the following substituted in its place and stead:

"Notices. All notices or other communications required or desired to be sent to Licensor, Agent, or Licensee shall be in writing and shall be sent by Registered or Certified Mail, postage prepaid, return receipt requested, or sent by telegram, charges prepaid to the address indicated below:

TO LICENSOR:    TITAN SPORTS, INC.
                1241 East Main Street
                Stamford, Connecticut 06902

TO AGENT:       LEISURE CONCEPTS INC.
                1414 Avenue of the Americas
                New York, New York  10019
                Attn: Alfred Kahn, Chairman


TO LICENSEE:    ACCLAIM ENTERTAINMENT, INC.
                71 Audrey Avenue
                Oyster Bay, New York  11771
                Attn:  Gregory Fischbach"

8. Paragraph 31 is deleted and the following substituted in its place and stead:

> "Notwithstanding any termination of this Agreement, pursuant to this paragraph 31, the provisions of paragraph 7, 8, 9, 18, 19, 20, 21, 22, 23, 26, 33 and 34 shall survive such termination period."

9.   All references to "Marvel Comics Group, Inc." in paragraph 23 of the Agreement shall be changed to "Marvel Entertainment Group, Inc.".

10. The following shall be added as 23 (A) (v) to the Agreement:

> "Notwithstanding anything to the contrary contained in this Amendment or in the Agreement, in connection with the use of the trademark Hulk Hogan and any related trademarks, the appropriate trademark designation, in lieu of the "R", should be TM in the United States and as directed by Licensor internationally."

11.  Paragraph 10 shall read:  "Notwithstanding anything contained in the Agreement to the contrary, it is understood that Licensee shall own from inception of the Agreement, any and all copyrights in and to the computer software embodied in any of the Licensed Articles.

12.  Paragraphs 3, 4 and 8 of the May Amendment are hereby deleted in their entirety.

13.   The following shall be added to Exhibit A (1) of the Agreement:

"The term Property shall additionally be as otherwise defined in paragraph 2 of this Agreement."

14.   Licensor hereby agrees to use commercially reasonable efforts from time to time to assist Licensee in the marketing and promotion of the Licensed Articles (it being understood that Licensee will bear the costs in preparing or providing the marketing and advertising materials as set forth below).  The parties hereto agree to periodically meet to discuss in good faith marketing, promotion and advertising that will be mutually beneficial to the parties hereto to maximize sales of the Licensed Articles and implement the foregoing.

15.   The dollar amounts of One Million ($1,000,000) Dollars contained in paragraph 27 of the Agreement are hereby deleted and replaced with Two Million ($2,000,000) Dollars.

16.   The phrase "Vice-President of Business Affairs" contained in paragraph 14 of the Agreement is hereby deleted and replaced with "Director of Licensing".

17.   The following shall be added to the end of paragraph 12 of the Agreement:

"Licensee acknowledges that the Agent/Licensor are currently revising the Materials referred in this paragraph 12.  Such new materials shall require that the trademarks "World Wrestling Federation" and the WWF logo be used in all copy, packaging and sales brochures in lieu of the block letters "WWF".  Licensee hereby agrees to commence with the foregoing requirement on all new Licensed Articles hereafter developed by Licensee notwithstanding the Agent's or Licensor's delay in delivering the revised Materials."

//

//

//

//

//

//

//

//

The capitalized terms shall, except as otherwise noted herein, have the same meaning and effect as set forth and defined in the Agreement. Except as otherwise provided herein the Agreement in all other respects is hereby ratified and confirmed.

Agreed to and Accepted:

TITAN SPORTS, INC.

By: _____

Agreed to and Accepted:

ACCLAIM ENTERTAINMENT, INC.

By: _____

Agreed to and Accepted:

LEISURE CONCEPTS, INC.

By: _____
as agent for Titan Sports, Inc.





**WORLD WRESTLING FEDERATION®**
December 31, 1997

EDWARD L. KAUFMAN
Vice President and General Counsel

Mr. Gregory Fishbach
Chief Executive Officer
Acclaim Entertainment
One Acclaim Plaza
Glen Cove, NY  06902

**Re:  Acclaim Entertainment ("Licensee") -w- Titan Sports, Inc. ("Titan")**

Dear Mr. Fishbach:

Reference is hereby made to that certain Merchandising License Agreement between the parties dated <u>March 17, 1988,</u> as amended by amendments to Agreement dated January 25, 1990, May 1, 1991 and April 21, 1993 (collectively "Agreement").  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties have agreed to amend the Agreement as follows ("Fourth Amendment"):

1.  The parties hereby amend the Agreement by adding a new section 18 to "Exhibit A" of the agreement as follows:  "Licensee has the right to sell the PC version of 'WWFArcade Game' with a separate jewel case as a single sales item using a single Stock Keeping Unit (SKU) number.

2.  Paragraph 29 of the Agreement is hereby amended as follows:  "Notwithstanding anything contained herein to the contrary, Titan hereby grants Licensee the right to:

(a)  Sublicense to Majesco Sales the right to sell the 16-bit Nintendo title, 'WWF SUPER WRESTLEMANIA' manufactured by the Licensee for Majesco Sales (hereinafter the "Majesco Licensed Articles").  Licensee shall pay to Titan, pursuant to the terms and conditions of the Agreement, the following per unit royalties: Twenty-five cents $ .25 per Majesco Licensed Article.  Sales of the Majesco Licensed Articles are permitted everywhere in the Territory except Japan.  This sublicense shall run concurrently with the Agreement.  In the event the Agreement terminates prior to the expiration of the term, the sublicense shall immediately terminate in conjunction therewith.

TITAN TOWER
1241 East Main Street
Post Office Box 3857
Stamford, CT 06902
Phone:203 352 8786
Fax:  203 353 0236

© Registered Trademark of Titan Sports, Inc

(b) Sublicense to Media Safari the right to manufacture and sell the PC version of 'W̵ ARCADE GAME' (hereinafter the "Media Safari Licensed Articles"). Titan will receive 50% of the net receipts received by Licensee for the Media Safari Licensed Articles ("Media Safari Net Reciepts"). Media Safari Net Receipts for purposes herein are defined as gross monies received by Licensee or credited to Licensee's account from the sale of the Media Safari Licensed Articles less (i) any and all excise, sales, value added or similar taxes; (ii) returns, discount or credits on account of sales of the Media Safari Licensed Articles and (iii) the commission of eighteen percent (18%) of such gross monies payable to SelectWare Technologies, Inc. This sublicense shall run concurrently with the Agreement. In the event the Agreement terminates prior to the expiration of the sublicense, the sublicense shall immediately terminate in conjunction therewith."

(c) Sublicense to Sonoma Multimedia the right to manufacture and sell the PC-CD version of the 'W̵ ARCADE GAME (hereinafter the "Sonoma Licensed Articles"). Titan will receive 25% of the net receipts received by Licensee for the Sonoma Licensed Articles ("Sonoma Net Receipts"). Sonoma Net Receipts for the purposes herein are defined as gross monies received by Licensee or credited to Licensee's account from the sale of the Sonoma Licensed Articles less (i) any and all excise, sales, value added or similar taxes; (ii) returns, discount or credits on account of sales of the Sonoma Licensed Articles (iii) the commission of eighteen percent (18%) of such gross monies payable to SelectWare Technologies, Inc. This sublicense shall be for a period of eighteen (18) months commencing on November 30, 1997 and ending on May 30, 1999. In the event the Agreement terminates prior to the expiration of the sublicense, the sublicense shall immediately terminate in conjunction therewith."

3. All terms not defined herein shall have the same meaning given them in the Agreement. Except as expressly or by necessary implication modified hereby, the terms and conditions of the Agreement are hereby ratified and confirmed without limitation or exception.

Mr. Gregory Fishbach
December 31, 1997
Page 3

Please confirm acceptance of the Fourth Amendment as set forth above on behalf of Licensee in the space provided below on each of the enclosed two (2) copies and return them to me. One fully executed copy will be returned to you for your records.

Very truly yours,

*Edward L. Kaufman*

Edward L. Kaufman

ACCEPTED AND AGREED:                          TITAN SPORTS, INC.
ACCLAIM ENTERTAINMENT                              ("Titan")
             ("Licensee")

By:_____                    _____
                                              By: Linda E. McMahon

Its:_____                   Chief Executive Officer

Date:_____                          Date: 2/18/98

copy

EDWARD L. KAUFMAN
(ph) 203-352-8786
(fax) 203-353-0236

May 29, 1998

Mr. Gregory Fishbach
Chief Executive Officer
Acclaim Entertainment
One Acclaim Plaza
Glen Cove, NY  06902

> **Re:  Acclaim Entertainment ("Licensee") -v- Titan Sports, Inc. ("Titan")**

Dear Mr. Fishbach:

Reference is hereby made to that certain Merchandising License Agreement between the parties dated March 17, 1988, as amended by amendments to Agreement dated January 25, 1990, May 1, 1991, April 21, 1993 and December 31, 1997 (collectively "Agreement"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties have agreed to amend the Agreement as follows ("Fifth Amendment"):

1. Notwithstanding anything to the contrary in paragraphs 4, 10, Exhibit A(8) of the Agreement, paragraph 2 of the Amendment to the Agreement dated as of May 1, 1991 or paragraph 3 of the Amendment to the Agreement dated as of April 21, 1993, the parties hereby agree to extend the Extended Term of the Agreement to November 15, 1999.

2. Licensee will not sell the Licensed Articles below normal list cost at any time during the Extended Term nor will Licensee ship during this period any quantity of Licensed Articles exceeding the quantity that was shipped between January 1, 1998 and November 15, 1998.

3. Notwithstanding anything to the contrary in paragraph 17 of the Agreement, upon expiration of the Agreement, there will be no sell-off period for any Licensed Articles which Licensee may have on hand or in process of manufacture on November 15, 1999.



4. All terms not defined herein shall have the same meaning given them in the Agreement. Except as expressly or by necessary implication modified hereby, the terms and conditions of the Agreement are hereby ratified and confirmed without limitation or exception.

Please confirm acceptance of the Fifth Amendment as set forth above on behalf of Licensee in the space provided below on each of the enclosed two (2) copies and return them to me. One fully executed copy will be returned to you for your records.

Very truly yours,

Edward L. Kaufman
Senior Vice President
General Counsel

ACCEPTED AND AGREED:

ACCLAIM ENTERTAINMENT                    TITAN SPORTS, INC.
      ("Licensee")                            ("Titan")

By:_____          _____
                                    By: Linda E. McMahon
Its:_____             President & Chief Executive Officer

Date:_____          Date: 6/3/98

\legal2\word\contracts\acclaim\merchandising license agreement

**ORIGINAL**

## SETTLEMENT AGREEMENT
## AND GENERAL RELEASE OF ALL CLAIMS

This Settlement Agreement and General Release of All Claims ("Agreement") is entered into this 1st day of October, 1999, by and between Acclaim Entertainment, Inc. ("Acclaim") with its principal place of business at One Acclaim Plaza, Glen Cove, New York, 06902 and World Wrestling Federation Entertainment, Inc. f/k/a Titan Sports, Inc. with its principal place of business at 1241 East Main Street, Stamford, CT 06902, ("WWFE") (hereinafter referred to individually as a "party" and collectively as the "parties").

WHEREAS, the parties entered into a Consumer Products License Agreement ("Agreement") dated March 17, 1988, wherein Acclaim was granted the right to produce, manufacture and distribute certain video game software and products ("Licensed Articles") on behalf of WWFE;

WHEREAS, this Agreement was thereafter extended and modified through a series of amendments, including without limitation an amendment dated May 29, 1998 ("May 1998 Amendment"), through and until November 15, 1999;

WHEREAS, the May 1998 Amendment provided, among other things, that Acclaim would not ship during the period May 1, 1999 through November 15, 1999 any quantity of the Licensed Articles exceeding that quantity shipped between January 1, 1998 and November 15, 1998 ("Shipment Limit");

WHEREAS, Acclaim acknowledged and agreed, in a Stop Shipment Acknowledgement dated September 14, 1999, attached hereto as Exhibit A and incorporated by this reference, that it would not ship any Licensed Articles after August 31, 1999 ("Stop Shipment Acknowledgement");

WHEREAS, WWFE, simultaneous thereto, commenced an audit of the books and records of Acclaim for the period from January 1, 1997 to March 31, 1999 ("Audit");

WHEREAS, the parties acknowledge that a dispute exists as to how much money, if any, Acclaim owes WWFE as a result of the foregoing Audit; and

WHEREAS, the parties, without admitting liability, desire to resolve any and all disputes that may exist between them, including without limitation the resolution to the Audit and if possible, the development of a subsequent product distribution plan beyond the Shipment Limit;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **TERMINATION DATE:**  The Agreement shall be and is hereby terminated and cancelled effective as of November 15, 1999 ("Termination Date").

OCT-01-1999 03:45pm From-

2.     **STOP SHIPMENT ACKNOWLEDGEMENT.** Acclaim hereby reaffirms, as per the terms of the Stop Shipment Acknowledgement, that it shall not and will not ship or distribute any Licensed Articles pursuant to the Agreement without the advance written permission of WWFE and WWFE's new licensee for the video category currently held by Acclaim, a joint venture known as THQ/Jakks ("TJ").

3.     **AUDIT PAYMENTS:** Pursuant to the results of a recently conducted Audit by WWFE, Acclaim shall pay to WWFE the sum of Six Hundred Seven Thousand and Two Hundred Forty Two US Dollars (US $607,242.00) ("Audit Fee"). Additionally, Acclaim agrees to amend and restate its second quarter 1999 royalty statement submitted to WWFE based upon an adjustment to the royalty rate for the Sony Playstation titles "Wrestlemania Arcade Classic" and "In Your House" from three percent (3%) to six percent (6%) ("Royalty Adjustment"). The Royalty Adjustment equals the sum of Eight Thousand Fifty Seven and 58/100 US Dollars (US $18,057.58). All costs and expenses associated with the Audit shall also be borne by Acclaim and shall be paid upon receipt of an invoice from David Beardon & Co., LLP which is submitted simultaneously herewith, in the sum of Twenty Eight Thousand US Dollars ($28,000.00) ("Expense"). WWFE acknowledges receipt of the Royalty Adjustment. All of the remaining fees (i.e. the Audit Fee and Expenses) shall be paid by Acclaim to WWFE by no later than September 30, 1999, in accordance with the following wiring instructions:

### U.S. DOLLAR WIRING INSTRUCTIONS

IBJ Schroder Bank & Trust Co.
One State Street
New York, New York 10004

ABA# 026007825
Customer Account Title: World Wrestling Federation Entertainment, Inc.
Account #: 88775508

4.     **RESERVATION OF AUDIT RIGHTS:** Notwithstanding anything to the contrary herein, it is understood and agreed that WWFE retains the right to conduct a further audit of Acclaim's books and records for the period April 1, 1999 through November 15, 1999. The additional audit shall be conducted in accordance with the terms and conditions of the Agreement. WWFE's right to conduct this additional audit shall in no manner whatsoever be compromised, altered, or modified as a result of the term and conditions of this Release, provided said audit is commenced by WWFE no later than December 31, 2000.

5.     **ADDITIONAL PRODUCT DISTRIBUTION PLAN:** Upon receipt of the Audit Fee, the Royalty Adjustment, the Expense and a fully executed original of this Release, WWFE shall, in turn, permit Acclaim and TJ to negotiate the shipment and distribution of additional Licensed Articles ("Product Distribution Plan") through the Termination Date. Any and all such Production Distribution Plans must be reduced to writing and executed by



Acclaim, WWFE and TJ prior to the implementation of said plan. Notwithstanding anything to the contrary herein, Acclaim acknowledges and agrees that WWFE is under no obligation and has made no guarantee or representation whatsoever that any Product Distribution Plan shall be approved by WWFE.

6.   **RELEASE OF KNOWN AND UNKNOWN CLAIMS:**

a) **Acclaim**: In consideration of the foregoing, Acclaim, its employees, officers, directors, licensees, successors, parent companies, affiliates, contractors, agents, assigns, heirs and any other person or entity claiming through them (hereinafter collectively referred to as "Acclaim"), hereby release WWFE, its parent companies, affiliates, subsidiaries, successors, assigns and its and their respective employees, officers, directors, contractors, licensees including without limitation TJ, representatives and agents ("Releasees") from any and all claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen, patent or latent, suspected or unsuspected, fixed or contingent, which Acclaim has or may have against Releasees, arising from, relating to, or based upon any cause, matter or reason whatsoever, arising from, relating to or in any manner connected with, directly or indirectly, the Agreement, except for those claims brought by third parties based solely on the exploitation of Licensed Property, as defined in and used in accordance with the Agreement. Acclaim acknowledges that it is aware that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses herein released, and Acclaim agrees that the within Release shall be and remain in effect in all respects as a complete and general release as to all matters released herein notwithstanding any such different or additional facts.

b) **WWFE.** In consideration of the foregoing, WWFE, its employees, officers, directors, licensees, successors, parent companies, affiliates, contractors, agents, assigns, heirs and any other person or entity claiming through them (hereinafter collectively referred to as "WWFE"), hereby release Acclaim, its parent companies, affiliates, subsidiaries, successors, assigns and its and their respective employees, officers, directors, contractors, licensees, representatives and agents ("Acclaim") from any and all claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen, patent or latent, suspected or unsuspected, fixed or contingent, which WWFE has or may have against Acclaim, arising from, relating to, or based upon any cause, matter or reason whatsoever, arising from, relating to or in any manner connected with, directly or indirectly, the Audit. WWFE acknowledges that it is aware that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses in connection with or arising from the Audit, and WWFE agrees that the within release shall be and remain in effect in all respects as a complete and general release as to all matters related to the Audit herein notwithstanding any such different or additional facts.

7.  **COVENANT NOT TO SUE**:

a) **Acclaim**: Acclaim furthermore agrees that it will not make, assert, or maintain against Releasees any claim, demand, action, suit or proceeding arising out of or in connection with the Agreement, the Release and the matters released herein, except for those claims brought by third parties based solely on the exploitation of Licensed Property as defined in and used in accordance with the Agreement. Acclaim further agrees to defend, indemnify and hold Releasees harmless from and against any claim, demand, right, damage, debt, liability, account, action, cause of action, cost or expense, including attorneys' fees actually paid or incurred (including allocable costs of in-house counsel), arising out of or in connection with the Agreement, this Release or the matters released herein.

b) **WWFE**: WWFE furthermore agrees that it will not make, assert, or maintain against Acclaim any claim, demand, action, suit or proceeding arising out of or in connection with the Audit. WWFE further agrees to defend, indemnify and hold Acclaim harmless from and against any claim, demand, right, damage, debt, liability, account, action, cause of action, cost or expense, including attorneys' fees actually paid or incurred (including allocable costs of in-house counsel), arising out of or in connection with the Audit.

8.  **CONFIDENTIALITY**:

a) **Acclaim**: Other than as may be required by applicable law, government order or regulation, or by judicial order or decree, Acclaim hereby acknowledges and agrees that in further consideration of WWFE's entering into this Release, Acclaim shall not, for any reason whatsoever, publicly divulge, announce or in any manner disclose to any person, organization, or publication, or utilize for the benefit or profit of Acclaim or any other person, organization, or publication, any of the following materials owned by WWFE: confidential business information, ideas, proposals, secrets, or any proprietary information obtained pursuant to the Agreement, this Release and/or regarding WWFE and its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as WWFE's reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, and any other WWFE owned tangible or intangible materials written, composed, submitted, added, improvised, or created in connection with the Agreement or this Release, and any and all information regarding any WWFE contractual relationships maintained by WWFE including the terms hereof. Acclaim further warrants and covenants that none of its officers, directors, employees or agents will violate the terms of this confidentiality provision.

b) **WWFE**: Other than as may be required by applicable law, government order or regulation, or by judicial order or decree, WWFE hereby acknowledges and agrees that in further consideration of Acclaim's entering into this Release, WWFE shall not, for any reason whatsoever, publicly divulge, announce or in any manner disclose to any person, organization, or publication, or utilize for the benefit or profit of WWFE or any other person, organization, or publication, any



of the following materials owned by Acclaim: confidential business information, ideas, proposals, secrets, or any proprietary information obtained pursuant to the Agreement, this Release and/or regarding Acclaim and its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as Acclaim's reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, and any other Acclaim owned tangible or intangible materials written, composed, submitted, added, improvised, or created in connection with the Agreement or this Release, and any and all information regarding any Acclaim contractual relationships maintained by Acclaim including the terms hereof. WWFE further warrants and covenants that none of its officers, directors, employees or agents will violate the terms of this confidentiality provision.

9.    **RELATIONSHIP OF PARTIES**:  Nothing contained in this Release shall be deemed or construed as creating any joint venture, partnership, employment, agency or other relationship between Acclaim and WWFE.

10.    **WAIVER**:  The failure at any time of any party to demand strict performance of the other party of any of the terms, covenants or conditions set forth in this Release shall not be construed as a continuing waiver or relinquishment thereof, and such party may, at any time, demand full, strict and complete performance by the other party of such terms, covenants and conditions.

11.    **SEVERABILITY**:  If any provision of this Release, or any part thereof, is determined to be invalid or unenforceable by any court of competent jurisdiction, it is the intention of the parties that the same shall be limited only to the minimum extent necessary to permit compliance with the minimum legal requirement and thereby remain in effect, that no other provision of this Release shall be affected thereby and that all such other provisions shall continue in full force and effect.

12.    **SURVIVAL**:  All representations, warranties and indemnities contained herein or made by either party in connection herewith shall survive the execution, delivery, suspension, expiration and/or termination of this Release or any provision hereto.

13.    **GOVERNING LAW; ARBITRATION; JURISDICTION**:

      a.    Governing Law:  This Release shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts entered into and to be fully performed therein.

      b.    Arbitration:  The parties agree that if a claim or controversy should arise concerning this Agreement, or the breach of any obligation arising under this Agreement, or the interpretation of this Agreement, such dispute shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association with the arbitration to be held in New York, New York.  The parties shall each pay one-half (1/2) of the cost of the arbitrator, and the arbitrator shall thereafter award costs and attorneys' fees to the prevailing party.  The arbitration award shall be binding and non-appealable, and may be entered as a final judgment in any court having jurisdiction over the award.

c.    Jurisdiction:  In connection with entering an arbitration award as a final judgment only, the parties hereto agree to submit to the jurisdiction of the United States District Court located in New York, New York and the New York County Supreme Court, located in New York, New York.  The parties agree that service of process by mail shall be effective service of same and such service shall have the same effect as personal service within the State of Connecticut and result in personal jurisdiction over the parties in the forum in the State of Connecticut.  The provisions contained in this Paragraph 9 shall survive the termination and/or expiration of this Agreement.

**14.    COMPLETE AGREEMENT:**    This Release constitutes the entire understanding of the parties and replaces and supersedes as of the date of execution any and all prior agreements and understandings, whether oral or written, between the parties including without limitation a partially executed Settlement Agreement and General Release of all claims dated September 29, 1999.  No change, modification, waiver or discharge of any or all of the terms and provisions of this Release shall be effective unless made in writing and executed by both of the parties hereto.

**15.    EXECUTION IN COUNTERPARTS:**  This Release may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**16.    FURTHER ASSURANCES:**    Both parties agree to execute such other further documents and do such other acts as may be required to effectuate the purposes of this Release including the respective rights of the parties hereunder.

**17.    SECTION AND OTHER HEADINGS:**  The section and other headings contained in this Release are for reference purposes only and shall not be deemed to be part of this Release or to affect the meaning or interpretation of this Release.

**18.    EXECUTION IN COUNTERPARTS:**  This Release may be executed any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**19.    ASSIGNMENT:**  This Release is non-assignable by Acclaim, unless the party to whom the Release is assigned shall remain fully and solely responsible for Acclaim's obligations hereunder.  This Release shall inure to the benefit of WWFE, its successors, assignees, licensees and grantees and associated, affiliated and subsidiary companies. WWFE may assign this Release in whole or in part without limitation or restriction.

**20.    NOTICES:**  All notices, statements, and other documents required to be given to each party shall be given in writing and sent, either by personal delivery, by registered mail postage prepaid, or by facsimile to the following addresses:

If to WWFE:

        World Wrestling Federation Entertainment, Inc.
        1241 East Main Street
        Stamford, CT 06902
        Attn:  Edward L. Kaufman
              Senior Vice President and General Counsel

If to Acclaim:

        Acclaim Entertainment, Inc.
        One Acclaim Plaza
        Glen Cover, NY 06902

        Attn:  Paul Eibeler
              Vice President and General Manager

With a copy to:    Fischbach, Perlstein & Lieberman
        1925 Century Park East Suite 1250
        Los Angeles, CA 90067

        Attn: Bernard J. Fischbach, Esq.

or such address as may be designated in writing by either party in a notice conforming with this Paragraph 20. The date of such mailing, personal delivery or facsimile shall be the date of delivery of such notice.

21.    **MISCELLANEOUS:**

        a.      If any action at law in equity is necessary to enforce or interpret the terms of this Release, the prevailing party shall be entitled to reasonable attorneys' fees and litigation costs in addition to any other relief to which it may be entitled.

        b.      All representations, warranties and indemnities contained herein or made by either party in connection herewith shall survive the execution, delivery, suspension, expiration and termination of this Release or any provision hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Release as of the date first written above.

ACCLAIM ENTERTAINMENT, INC.

("ACCLAIM")

By: _____
           CFO

Print Name: William Sorendon

Its: CFO

Date: 10-1-99

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC.
("WWFE")

By: _____
          Linda E. McMahon
President and Chief Executive Officer

Date: 10/21/99

STATE OF CONNECTICUT )
                                  ) ss:
COUNTY OF FAIRFIELD )

On _October 4_, 19_97_ before me _Karen Shapiro_ personally came Linda E. McMahon, President and Chief Executive Officer, to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she is a duly authorized corporate officer of World Wrestling Federation Entertainment, Inc. and that she executed the same on behalf of World Wrestling Federation Entertainment, Inc.

_Karen Shapiro_
WITNESS

My commission expires: _____

KAREN SHAPIRO
NOTARY PUBLIC, STATE OF CT
MY COMMISSION EXPIRES SEP. 30, 2003

STATE OF _NY_ )
                    ) ss:
COUNTY OF _Nassau_ )

On _Oct. 1_, 19_99_ before me _William Sorenson_ personally came _____ to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he is a duly authorized corporate officer of Acclaim Entertainment, Inc. and that he executed the same on behalf of Acclaim Entertainment, Inc.

_Marion Weisfelner_
WITNESS

My commission expires: _7/17/01_

MARION WEISFELNER
Notary Public, State of New York
No. 4863468
Qualified in Nassau County
Commission Expires July 17, 20 01

## STOP SHIPMENT ACKNOWLEDGMENT

As of August 31, 1999, Acclaim Entertainment, Inc. ("Acclaim") acknowledges and agrees that it has shipped all units of the Licensed Articles permitted under the terms of a certain amendment dated May 29, 1998 to a Consumer Products License Agreement entered into between the parties ("Amendment"). Thereafter through expiration of the Agreement on November 15, 1999, Acclaim represents and warrants that it will not ship any Licensed Articles, in any form or manner, or under any circumstances, whatsoever, without the advance written permission of World Wrestling Federation Entertainment, Inc. ("WWFE"). To that end, Acclaim acknowledges that the terms and conditions of the Amendment remain in full force and effect and are hereby ratified and affirmed. Furthermore, Acclaim agrees that WWF shall have the right, in its sole discretion, to audit Acclaim's records relating to the sale and shipment of Licensed Articles, upon two (2) business days advance written notice and during normal business hours, to monitor and confirm compliance with the foregoing conditions.

ACCLAIM ENTERTAINMENT, INC.

By: _Paul Eibeler_

Print Name: _Paul Eibeler_

Its: _V.P. - 6mm_

Date: _9-14-99_



World Wrestling
Federation

TITAN SPORTS, INC
1241 East Main St.
P.O. Box 3857
Stamford, CT 06902
Tel. 203.352.8600

**Via Facsimile & Federal Express**

October 15, 1999

Acclaim Entertainment
One Acclaim Plaza
Glen Cove, NY 06902

Attn:   Bill Sorenson
        Chief Financial Officer

Re:     **Additional Licensed Product Distribution Plan**

Dear Mr. Sorenson:

The letter serves to set forth in the terms and conditions of an agreement ("Letter Agreement") between World Wrestling Federation Entertainment, Inc. ("WWFE") and Acclaim Entertainment, Inc. ("Acclaim"), wherein WWFE and Acclaim agree to a distribution of the Licensed Articles beyond the restrictions and limitations, originally defined in a Consumer Products License Agreement dated March 17, 1988 and as thereafter amended including without limitation an amendment dated May 29, 1998 ("May '98 Amendment) (collectively "License Agreement"). The specific terms and conditions of this Letter Agreement are as follows:

1. Acclaim acknowledges and reaffirms that the terms of a Settlement Agreement and General Release of All Claims dated October 1, 1999 between WWFE ("Settlement Agreement") is in full force and effect as of the date hereof. Acclaim furthermore acknowledges that in the event of conflict between this Letter Agreement, the License Agreement, and the Settlement Agreement, the Settlement Agreement shall control except for as it relates to paragraph 2 of the Settlement Agreement in which case the terms of the Letter Agreement controls.

2. The License Agreement shall be and is hereby terminated and cancelled effective as of November 15, 1999 ("Termination Date").

3. WWFE acknowledges and agrees that Acclaim may distribute the Licensed Articles beyond the permitted product limitations and restrictions set forth in the May '98 Amendment (and reaffirmed in the Settlement Agreement) based on the following conditions:

a) Acclaim shall not ship to customers within the United States and Canada more than 300,000 units of the Licensed Article known as the WWFE "Attitude" Game ("Attitude Game") for use on the Sony Play Station platform and the foregoing shipment must be completed prior to November 5, 1999;

b) Acclaim shall not ship to customers outside the United States and Canada more than 175,000 units of the Attitude Game for use on the Sony Play



Station platform and the foregoing shipment must be completed prior to November 5, 1999;

   c) Acclaim shall not ship to customers within the United States and Canada more than 250,000 units of the Attitude Game for use on the Dreamcast platform and the foregoing shipment must be completed prior to the Termination Date;

   d) Acclaim shall not ship to customers outside the United States and Canada more than 100,000 units of the Attitude Game for use on the Dreamcast platform and the foregoing shipment must be completed prior to the Termination Date;

   e) After the Termination Date, Acclaim may distribute no more than 500,000 units of the Attitude Game for the Sony Classic Line provided said distribution is made solely through THQ/Jakks Pacific LLC ("TJ"), the new video game licensee of WWFE. To that end, Acclaim agrees in good faith to make any change and/or modification to the content, format and/or packaging of the Attitude Game for the Sony Classic Line as requested by TJ and/or WWFE pursuant to the Memo, as defined below, relating to such changes.

   f) None of the Attitude Games shipped by Acclaim shall be useable and/or applicable to the Nintendo 64 or Gameboy platforms;

   g) Except as set forth in subparagraph (e) above, Acclaim and any and all entities controlled by or under common control by Acclaim shall not, under any circumstances whatsoever, ship any unit of the Licensed Articles after the Termination Date; and

   h) Acclaim shall not, nor will any entity controlling, controlled by or under common control with Acclaim, ship or advertise any non WWFE wrestling related video games prior to January 1, 2000.

   (the subparagraphs (a) through (h) set forth above shall be hereinafter collectively referred to as "Limited Distribution Plan").

   i) Acclaim acknowledges, agrees and consents to TJ's distribution of WWFE video games on the Nintendo 64 and Gameboy platforms on or after November 1, 1999, despite the exclusive nature of the License Agreement in effect as of that date hereof between Acclaim and WWFE ("Nintendo/Gameboy Product Distribution");

   4. The License Agreement and Settlement Agreement are hereby amended to incorporate the Limited Distribution Plan and Nintendo/Gameboy Product Distribution.



5. Based on Acclaim's strict compliance with the terms of this Letter Agreement including the Limited Distribution Plan and Nintendo/Gameboy Product Distribution set forth above, WWFE consents to Acclaim entering into a Memorandum of Agreement ("Memo") dated October, 1999 with TJ for the distribution of the Licensed Articles in accordance with the terms hereof.

6. Acclaim will indemnify, defend and hold WWFE, its parent, affiliated companies, subsidiary companies, related companies and successors and assigns, and its and their respective officers, directors, employees, successors, licensees, contractors and assigns harmless from and against all actions, suits, proceedings, judgments, claims, liabilities, losses or expenses whatsoever, including reasonable attorneys' fees (including an allocation for in-house counsel fees and expenses) (1) arising from a breach of any of Acclaim's obligations, representations or warranties under this Letter Agreement; (2) arising directly or indirectly from the terms and conditions set forth in the Memo; and/or (3) arising from any dispute between TJ and Acclaim relative to the Licensed Articles. Notwithstanding the foregoing, WWFE acknowledges and agrees that claims brought by third parties based solely on the exploitation of Licensed Property as defined in and use in accordance with the Licensed Agreement are not included in this indemnification provision.

7. All other terms and conditions relative to this Letter Agreement, including without limitation the royalty rates due WWFE as a result of the Limited Distribution Plan, and the audit and record keeping provisions shall be interpreted in accordance with the License Agreement and Settlement Agreement.

8. Notwithstanding anything to the contrary herein, except for distribution to the Sony Classic Line pursuant to subparagraphs 3(e) and except for TJ's distribution of Nintendo/Gameboy Product pursuant to 3(i) above, any and all monies due WWFE from Acclaim as a result of the License Agreement and the Limited Distribution Plan shall be paid in full to WWFE by no later than December 31, 1999. With regard to subparagraphs 3(e) and 3(i), WWFE will seek payment from TJ with respect to monies generated therefrom.

9. If any provision of this Letter Agreement, or any part thereof, is determined to be invalid or unenforceable by any court of competent jurisdiction, it is the intention of the parties that the same shall be limited only to the minimum extent necessary to permit compliance with the minimum legal requirement and thereby remain in effect, that no other provision of this Letter Agreement shall be affected thereby and that all such other provisions shall continue in full force and effect.

10. All representations, warranties and indemnities contained herein or made by either party in connection herewith shall survive the execution, delivery, suspension, expiration and/or termination of this Letter Agreement or any provision hereof.



11. Both parties agree to execute such other further documents and do such other acts as may be required to effectuate the purposes of this Letter Agreement including the respective rights of the parties hereunder.

12. No change, modification, waiver or discharge of any or all of the terms and provisions of this Letter Agreement shall be effective unless made in writing and executed by both of the parties hereto.

Kindly confirm your agreement by signing this letter in the space provided below and return it to WWFE for countersignature. Thereafter, a fully-executed copy will be forwarded to Acclaim for its records.

Sincerely yours,

C. Scott Amann
Associate Counsel

CSA:lm

cc:     Edward L. Kaufman
        Jim Bell

**ACKNOWLEDGED AND AGREED:**

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC.
("WWFE")

By: _Linda E McMahon_

   Linda E. McMahon

   President and Chief Executive Officer

Date: __10/21/99__

ACCLAIM ENTERTAINMENT,
 INC.
("Acclaim ")

By: _____

Print Name: _William Sorenson_

Title: _CFO_

Date: _10/18/99_



World Wrestling
Federation

WORLD WRESTLING
FEDERATION
ENTERTAINMENT, INC.
1241 East Main St.
P.O. Box 3857
Stamford, CT 06902
Tel: 203 352 8600

April 24, 2000

Acclaim Entertainment
One Acclaim Plaza
Glen Cove, NY 11542

**Attn:** Mr. William Sorenson
Chief Financial Officer

**Re:** Amendment to Limited Licensed Product Distribution Plan

Dear Mr. Sorenson:

This letter serves to outline the terms and conditions of an amendment ("Amendment") to a certain Letter Agreement dated October 15, 1999, between World Wrestling Federation Entertainment, Inc. ("WWFE") and Acclaim Entertainment Inc. ("Acclaim") ("Letter Agreement"), wherein WWFE and Acclaim agree to another limited distribution of the Licensed Articles beyond the restrictions and limitations set forth in a WWFE/Acclaim Settlement Agreement dated October 1, 1999 ("Settlement Agreement") and the WWFE/Acclaim Consumer Products License Agreement dated March 17, 1988 (and as thereafter amended)("License Agreement"). The specific terms and conditions of the Amendment are as follows:

1. Acclaim hereby acknowledges and reaffirms that the terms of the above-referenced Letter Agreement and Settlement Agreement are in full force and effect as of the date hereof. Acclaim furthermore acknowledges that in the event of conflict between this Amendment, the Letter Agreement, the License Agreement, and the Settlement Agreement, the Settlement Agreement shall control.

2. Notwithstanding anything to the contrary, WWFE acknowledges and agrees that Acclaim may distribute certain Licensed Articles, as specified below, beyond the Termination Date, as that term is defined in the Settlement Agreement (and later reaffirmed in the Letter Agreement), in accordance with the following product and distribution schedule:

(a) Commencing on April 1, 2000 and terminating on May 31, 2000 ("Final Distribution Window"), Acclaim shall have the limited right, subject to THQ/Jakks Pacific LLC ("TJ") approval, to sell and ship to its customers the specific inventory itemized below:

| Game Title: | | "WARZONE" | "ATTITUDE" |
|---|---|---|---|
| Game Platforms: | N64 | 61,257 units | 2,915 units |
| | PLAYSTATION | 36,731 units | 2,537 units |

(b) Upon expiration of this Final Distribution Window, Acclaim again acknowledges that it will not ship, sell, manufacture or distribute the Licensed Articles in any manner without the express written permission of WWFE, except for as previously provided in paragraph 3(e) of the Letter Agreement. (Subparagraphs

Page 1 of 3

\\TITAN\SYS\USERS\Legal Affairs\Consumer Products License Agreements\Acclaim Entertainment amd ltd lic prod distr plan 4-24-00 doc

Stamford     New York     Chicago     Toronto     Las Vegas



Kindly confirm your agreement by signing this letter in the space provided below and return it to WWFE for countersignature. Thereafter, a fully-executed copy will be forwarded to Acclaim for its records.

Sincerely yours,

C. Scott Amann
Associate Counsel

CSA:lm

cc:    Edward L. Kaufman

**ACKNOWLEDGED AND AGREED:**

**WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC.**
("WWFE")

By: _Edward L. Kaufman_ | SVP + GC
Linda E. McMahon
President and Chief Executive Officer

Date: _5/15/00_

**ACCLAIM ENTERTAINMENT,
INC.**
("Acclaim ")

By: _____
William Sorenson
Chief Executive Officer
CFO

Date: _4/26/00_